**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

COMMON CAUSE RHODE ISLAND, LEAGUE OF
WOMEN VOTERS OF RHODE ISLAND, MIRANDA
OAKLEY, BARBARA MONAHAN, and MARY
BAKER,

                            Plaintiffs,

              - against -

NELLIE M. GORBEA, in her official capacity as Secretary
of State of Rhode Island; DIANE C. MEDEROS, LOUIS
A. DESIMONE JR., JENNIFER L. JOHNSON,
RICHARD H. PIERCE, ISADORE S. RAMOS, DAVID
H. SHOLES, and WILLIAM E. WEST, in their official
capacity as members of the Rhode Island Board of
Elections,

                            Defendants.

Case No.  1:20-cv-00318-MSM-
LDA

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR EMERGENCY MOTION FOR A TEMPORARY**
**RESTRAINING ORDER AND DECLARATORY AND INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

EXHIBIT LIST ............................................................................................................... x

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 4

   A.   The COVID-19 Pandemic ...................................................................... 4

   B.   The Spread Of COVID-19 In Rhode Island ......................................... 6

   C.   The Public Health Response To COVID-19 ........................................ 8

   D.   Rhode Island's Suspension Of The Witness Or Notary Requirement For The
Presidential Primaries ......................................................................... 10

   E.   Rhode Island's Upcoming Primary And General Elections ............... 14

   F.   Rhode Island's Mail Ballot Process And The Challenged Witness/Notary Requirement
............................................................................................................. 15

   G.   Rhode Island's Laws Supporting Election Integrity For Voting By Mail .................. 17

   H.   The Public Health And Disenfranchisement Consequences Of Rhode Island's Witness
Or Notary Requirement During The COVID-19 Pandemic ................ 18

   I.   Injuries And Irreparable Harm To Plaintiffs ..................................... 19

ARGUMENT ................................................................................................................ 22

   A.   Plaintiffs are likely to prevail on the merits of their constitutional claim because the
witness or notary requirement unduly burdens the right to vote under the present
circumstances. .................................................................................... 23

       1. The anderson-burdick framework ........................................... 24

      2.   The witness or notary requirement merits at least heightened scrutiny because it will
disenfranchise thousands of voters while worsening a public health crisis ............... 26

   B.   Plaintiffs are likely to prevail on the merits of their americans with disabilities act claim
because the witness or notary requirement excludes and fails to accommodate disabled
individuals. ......................................................................................... 34

   C.   The harm inflicted upon voters far outweighs the state's interest in election integrity . 37

   D.   A preliminary injunction is necessary to prevent irreparable harm to plaintiffs'
constitutional rights. .......................................................................... 40

   E.   The balance of hardships and the public interest support injunctive relief. .................. 44

CONCLUSION ............................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**

*Action NC v. Stranch*,
 216 F. Supp. 3d 597 (M.D.N.C. 2016) ............................................................... 42, 43

*Acosta v. Restrepo*,
 2020 U.S. Dist. LEXIS 115782 (D.R.I. 2020) ........................................................ 43

*Anderson v. Celebrezze*,
 460 U.S. 780 (1983) ......................................................................................... 22, 23, 25

*Asociación de Educación Privada de Puerto Rico*,
 490 F.3d 1 (1st Cir. 2007) ...................................................................................... 40

*Ayers-Schaffner v. DiStefano*,
 860 F. Supp. 918 (D.R.I. 1994) ................................................................................ 24

*Barr v. Galvin*,
 626 F.3d 99 (1st Cir. 2010) ...................................................................................... 23

*Burdick v. Takushi*,
 504 U.S. 428, 434 (1992) .................................................................................. 22, 23, 25

*Common Cause Georgia v. Kemp*
 347 F. Supp. 3d 1270 (N.D. Ga. 2018) ................................................................... 41

*Crawford v. Marion Cty. Election Bd.*,
 553 U.S. 181, 198–99 (2008) .............................................................................. 24, 25

*Dem. Exec. Comm. of Fla. v. Lee*,
 915 F.3d 1312, (11th Cir. 2019) .............................................................................. 30

*Democratic Nat'l Comm. v. Bostelmann*,
 2020 U.S. Dist. LEXIS 57918, 2020 WL 1638374 (D. Wisc. Apr. 2, 2020) ......... 24

*Elrod v. Burns*,
 427 U.S. 347 (June 28, 1976) .................................................................................. 39

*Equal Means Equal v. Dept' of Educ.*,
 2020 U.S. Dist. LEXIS 46810 (D. Mass. 2020) ...................................................... 42

*Fla. Democratic Party v. Scott*,
 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016) ......................................................... 41

*Frank v. Walker*,
 819 F.3d 384, 386 (7th Cir. 2016) ........................................................................... 24

*Giovani Carandola, Ltd. v. Bason*,
 303 F.3d 507, 521 (4th Cir. 2002) ........................................................................... 44

*Griffin v. Burns*,
 431 F. Supp. 1361 (D.R.I. 1977) .............................................................................. 43

*Harper v. Va. State Bd. of Elections*,
 383 U.S. 663 (1966) .................................................................................................. 22

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982) .................................................................................................. 42

*Ind. State Conf. of the NAACP v. Lawson*,
 326 F. Supp. 3d 646 (S.D. Ind. 2018) ..................................................................... 43

*Jones v. Governor of Fla.*,
 950 F.3d 795 (11th Cir. 2020) ................................................................................. 41

*League of Women Voters of Fla. v. Browning*,

863 F. Supp. 2d 1155 (N.D. Fla. 2012)......................................................... 43

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ...................................................... 28, 30, 40, 43

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................................... 42

*League of Women Voters of Va. v. Va. State Bd. of Elections*,
No. 6:20-CV-00024, 2020 U.S. Dist. LEXIS 79439 (W.D. Va. May 5, 2020)........ 3, 23, 30, 31

*McLaughlin v. N.C. Bd. of Elections*,
65 F.3d 1215 (4th Cir. 1995) ................................................................. 24

*N.C. State Conf. of NAACP v. Cooper*,
No. 1:18CV1034, 2019 WL 7372980 (M.D.N.C. Dec. 31, 2019)........................... 41

*Nat'l Fed'n of the Blind v. Lamone*,
813 F.3d 494 (4th Cir. 2016) ................................................................. 37

*Norman v. Reed*,
502 U.S. 279, 112 S. Ct. 698, 116 L. Ed. 2d 711 (1992)..................................... 24

*Northeast Ohio Coalition for the Homeless v. Husted*,
837 F.3d 612 (6th Cir. 2016) ................................................................. 37

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) ................................................................. 40

*One Wisconsin Inst., Inc. v. Thomsen*,
198 F. Supp. 3d 896 (W.D. Wis. 2016) ....................................................... 24

*One Wisconsin Inst., Inc. v. Thomsen*,
351 F. Supp. 3d 1160 (W.D. Wis. 2019) ..................................................... 24

*People First of Ala. v. Merrill*,
No. 2:20-cv-00619-AKK, 2020 U.S. Dist. LEXIS 104444 (N.D. Ala. June 15, 2020). ........... 3

*Price v. N.Y. State Bd. Of Elections,*
540 F.3d 101 (2d Cir. 2008)................................................................... 25

*Respect Me. PAC v. McKee*,
622 F.3d 13 (1st Cir. 2010) ................................................................... 22

*Sallaj v. United States Immigration & Customs Enf't ("ICE")*,
U.S. Dist. LEXIS 72857 (D.R.I. 2020). ...................................................... 23

*Saucedo v. Gardner*,
335 F. Supp. 3d 202 (D.N.H. 2018)................................................... 28, 36, 37

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
699 F.3d 1, 10 (1st Cir. 2012)................................................................. 22

*Thakker v. Doll*,
No. 1:20-CV-480, 2020 WL 1671563, at (M.D. Pa. Mar. 31, 2020) ....................... 41

*Thomas v. Andino*,
Civil Action No. 3:20-cv-01552-JMC, 2020 U.S. Dist. LEXIS 90812 (D.S.C. May 25, 2020) 3,
22, 31, 42

*Werme v. Merrill*,
84 F.3d 479 (1st Cir. 1996) ................................................................... 24

*Williams v. Salerno*,
792 F.2d 323 (2d Cir. 1986)................................................................... 40

*Wine and Spirits Retailers, Inc. v. Rhode Island*,
418 F.3d 36 (1st Cir. 2005)................................................................... 22

## Statutes and Regulations

28 C.F.R. § 35.108(a)(1) ................................................................................ 34
28 C.F.R. § 35.130(b)(7) ................................................................................ 35
28 C.F.R. § 35.130(b)(8) ................................................................................ 34
42 U.S.C. § 12102(1) ..................................................................................... 34
Ala. Code §§ 17-11-7 ..................................................................................... 16
N.C. Gen. Stat. Ann. § 163-231(a) ................................................................ 16
N.C. Session Law 2020-17 §1(a) .................................................................... 16
R.I. Gen. Laws § 17-11-10 .............................................................................. 16
R.I. Gen. Laws § 17-20-1 ................................................................................ 38
R.I. Gen. Laws § 17-20-14(a) ......................................................................... 15
R.I. Gen. Laws § 17-20-2(1) ........................................................................... 15
R.I. Gen. Laws § 17-20-2(2) ........................................................................... 14
R.I. Gen. Laws § 17-20-2(3)-(4) ..................................................................... 15
R.I. Gen. Laws § 17-20-2.1(c) ........................................................................ 14
R.I. Gen. Laws § 17-20-2.1(d)(1) ................................................................... 15
R.I. Gen. Laws § 17-20-2.1(d)(3) ................................................................... 15
R.I. Gen. Laws § 17-20-2.1(d)(4) ................................................................... 15
R.I. Gen. Laws § 17-20-2.2(a). ........................................................... 14, 15, 17
R.I. Gen. Laws § 17-20-2.2(b) ........................................................................ 15
R.I. Gen. Laws § 17-20-23 .............................................................................. 16
R.I. Gen. Laws § 17-20-26(c)(2) ............................................................... 17, 37
R.I. Gen. Laws § 17-23-3 ................................................................................ 38
R.I. Gen. Laws § 17-23-4 ................................................................................ 18
R.I. Gen. Laws § 17-26-1 ................................................................................ 18
R.I. Gen. Laws § 17-20-21 .............................................................................. 16

## Other Authorities

*2016 Presidential Primary Statewide Summary*, ST. OF R.I. BD. OF ELECTIONS (updated May 4, 2016), https://www.ri.gov/election/results/2016/presidential_preference_primary/# ........ 12, 26
*2020 Presidential Preference Primary Statewide Summary*, ST. OF R.I. BD. OF ELECTIONS (updated July 2, 2020), https://www.ri.gov/election/results/2020/presidential_preference_primary/#. ...................... 11
*2020 Presidential Primary Election Task Force Presentation*, R.I. DEP'T OF ST. (July 9, 2020), https://vote.sos.ri.gov/Content/Pdfs/PPP%20Task%20Force%20July%209%202020%20Final. pdf ......................................................................................................... 12, 26, 31
*2020 Presidential Primary Elections Task Force Preliminary Overview 3* (July 1, 2020).......... 11
*A Sampling of Recent Election Fraud Cases from Across the United States*, HERITAGE FOUND. (accessed July 17, 2020), https://www.heritage.org/voterfraud. ........................................ 18, 36
Alexandra Leslie & Melanie DaSilva, *RI Secretary of State Announces Legislation for Mail-Based Voting in the Fall*, WPRI (June 12, 2020), https://www.wpri.com/news/elections/r-i-secretary-of-state-set-to-introduce-legislation-for-mail-based-voting-in-the-fall/. ...... 11, 30, 39
*All About the Rhode Island Presidential Primary: A Guide for Eligible Voters*, R.I. DEP'T OF ST. (JUNE 2, 2020) https://vote.sos.ri.gov/Content/Pdfs/June2PPPGuide.pdf. ................... 11, 29 38

*An Act Relating to Elections--Mail Ballots, S 2598 Substitute A*, R.I. GEN. ASSEMBLY, Jan.
Session (2020), available at
http://webserver.rilin.state.ri.us/BillText/BillText20/SenateText20/S2598A.pdf. ................... 14

Betsy Klein, *Task force report says 18 states in coronavirus 'red zone' should roll back
reopening*, CNN (July 17, 2020) https://www.cnn.com/2020/07/17/politics/white-house-states-
hot-spots-task-force/index.html. ...................................................................................................... 7

Brian Amaral, *Watchdog Team: What the Models Got Right, and Wrong, about Coronavirus in
R.I.*, PROVIDENCE JOURNAL (July 17, 2020),
https://www.providencejournal.com/news/20200717/watchdog-team-what-models-got-right-
and-wrong-about-coronavirus-in-ri .................................................................................................. 6

*Cases in the US*, CENTER FOR DISEASE CONTROL AND PREVENTION,
https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated July
22, 2020). ............................................................................................................................................. 6

Chad D. Cotti et al., *The Relationship Between In-Person Voting, Consolidated Polling
Locations, and Absentee Voting on COVID-19: Evidence From the Wisconsin Primary*,
Working Paper 27187, NAT'L BUREAU OF ECON. RESEARCH (May 2020), available at
https://www.nber.org/papers/w27187 ....................................................................................... 29, 41

*Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018) ...................... 42

*Considerations for Polling Locations*, CENTER FOR DISEASE CONTROL AND PREVENTION,
https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last
updated June 22, 2020). .................................................................................................................... 11

*Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES,
https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html. (accessed July 19,
2020). ................................................................................................................................................... 7

*Covid-19 Dashboard by the Center for Systems Science and Engineering at Johns Hopkins
University*, JOHNS HOPKINS U. CORONAVIRUS RESOURCE CENTER
https://coronavirus.jhu.edu/map.html (last visited July 22, 2020) ................................................... 4

*COVID-19 Projections*, THE INST. FOR HEALTH METRICS AND EVALUATION,
https://covid19.healthdata.org/united-states-of-america (updating regularly) (last accessed July
22, 2020). ............................................................................................................................................. 5

*Covid-19 Watch - Weekly Covid-19 Surveillance Report*, CNTY.OF SAN DIEGO HEALTH AND
HUMAN SERVICES AGENCY  (July 14, 2020), available at
https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/COVID-
19%20Watch.pdf. ................................................................................................................................ 5

*COVID-NET: A Weekly Summary of U.S. COVID-19 Hospitalization Date: COVID-19
Laboratory-Confirmed Hospitalizations*, CENTER FOR DISEASE CONTROL AND PREVENTION,
https://gis.cdc.gov/grasp/COVIDNet/COVID19_5.html (last visited July 21, 2020). ............... 5

*Demographic Trends of COVID-19 Cases and Deaths in the US Reported to CDC*, CENTER FOR
DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/covid-data-
tracker/index.html#demographics (last updated July 21, 2020). ....................................................... 5

Donald G. McNeil Jr., *The Pandemic's Big Mystery: How Deadly is the Coronavirus?*, N.Y.
TIMES (July 4, 2020), https://www.nytimes.com/2020/07/04/health/coronavirus-death-
rate.html (last updated July 15, 2020) ................................................................................................ 5

*Elections Data-Voter Turnout*, R.I. DEP'T OF ST. (accessed 7/22/2020),
https://vote.sos.ri.gov/DataInformation/VoterTurnout. ..................................................................... 19

Eric Lynch, *Are Rhode Island's Mail in Ballots a "Gigantic, Illegal Loophole,"* WM. & MARY L. SCH.: ELECTION L. SOC'Y (Apr. 11, 2018), http://electls.blogs.wm.edu/2018/04/11/rhode-islands-mail-ballots-gigantic-illegal-loophole/. .................................................................. 17, 37

Eric Lynch, *Are Rhode Island's Mail in Ballots a "Gigantic, Illegal Loophole,"* WM. & MARY L. SCH.: ELECTION L. SOC'Y (Apr. 11, 2018), http://electls.blogs.wm.edu/2018/04/11/rhode-islands-mail-ballots-gigantic-illegal-loophole/. ........................................................................ 40

Erica Ponte, *RI Secretary of State encourages mail ballot voting in presidential primary*, WPRI (May 14, 2020), https://www.wpri.com/news/elections/ri-secretary-of-state-encourages-mail-ballot-voting-in-presidential-primary/. ............................................................................ 10, 38

*Fourth General Order Regarding Continuity of Operations During Coronavirus Pandemic* (D.R.I. June 29, 2020), https://www.rid.uscourts.gov/sites/rid/files/FourthGeneralOrderOperations.pdf...................... 9

Fransisco Perez-Saez et al., *Serology-informed Estimates of SARS-COV-2 Infection Fatality Risk in Geneva, Switzerland*, OSF PREPRINTS , https://osf.io/wdbpe/ (last updated June 15, 2020). 4, 31

G. Wayne Miller, *R.I. Faces Uncertain COVID-19 Prognosis for Fall*, PROVIDENCE JOURNAL (July 19, 2020), https://www.providencejournal.com/news/20200718/ri-faces-uncertain-covid-19-prognosis-for-fall. ..................................................................................................... 9

*How COVID-19 Spreads,* CENTER FOR DISEASE CONTROL AND PREVENTION (last updated June 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html. ........................................................................................................................ 4

*Information for Hospital Visitors*, LIFESPAN (updated July 15, 2020) ......................................... 14

Jasmine C. Lee et al., *See How All 50 States Are Reopening (and Closing Again)*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html (last updated July 21, 2020).................................................................................................... 7

Katherine J. Wu, *Study of 17 Million Identifies Crucial Risk Factors for Coronavirus Deaths*, N.Y. TIMES, https://www.nytimes.com/2020/07/08/health/coronavirus-risk-factors.html (last updated July 17, 2020)..................................................................................................... 6

Letter to Governor Raimondo, R.I. ACLU (June 30, 2020), http://riaclu.org/images/uploads/VAC_letter_to_Governor_FINAL_20200630.pdf. .............. 13

*Mail Ballot*, ST. OF R.I. BD. OF ELECTIONS, https://elections.ri.gov/voting/mailballot.php (last accessed July 18, 2020)........................................................................................................ 16

Mark Reynolds, *R.I. Approves Electronic Notarization During Coronavirus Outbreak*, PROVIDENCE JOURNAL (April 6, 2020), https://www.providencejournal.com/news/20200406/ri-approves-electronic-notarization-during-coronavirus-outbreak............................................................................................... 16, 32

Monica Anderson and Andrew Perrin, *Tech Adoption Climbing Among Older Adults*, PEW RESEARCH CENTER (May 17, 2017), https://www.pewresearch.org/internet/2017/05/17/barriers-to-adoption-and-attitudes-towards-technology/................................................................................................................... 33

*Notary Public and Justice of the Peace (JP) Status Lookup*, R.I. SEC'Y OF ST., http://business.sos.ri.gov/notarypublicsearch/ (last visited July 20, 2020)............................... 33

*Older Adults*, CENTER FOR DISEASE CONTROL AND PREVENTION *(June 25, 2020)*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html......... 31

*People with Disabilities*, CENTER FOR DISEASE CONTROL AND PREVENTION *(April 7, 2020)*,
 https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-
 disabilities.html. ........................................................................................... 6, 32, 35

Press Release, *Gina Raimondo, Governor of Rhode Island, Rhode Island to Move to Phase 3
 Tuesday, Governor Extends Executive Orders* (June 29,2020),
 https://www.ri.gov/press/view/38720. ........................................................................ 8

Press Release, *Office of the Secretary of State, Task Force Releases Recommendations for Safe
 and Secure Fall Elections in Rhode Island* (July 9, 2020),
 https://www.ri.gov/press/view/38803. ...................................................................... 12

Press Release, *Rhode Island to Move to Phase 3 Tuesday, Governor Extends Executive Orders*
 (June 29, 2020), https://www.ri.gov/press/view/38720. ............................................. 2

Press Release, *Secretary Gorbea to Rhode Islanders: Vote from Home this Week* (May 26, 2020),
 https://www.ri.gov/press/view/38424. ............................................................. 2, 10, 38

*Process for Remote Online Notarization (RON) of Paper Documents*, R.I. DEP'T OF ST., available
 at
 https://www.sos.ri.gov/assets/downloads/documents/RON_Tangible_Document_Bulletin.pdf.
 ................................................................................................................................. 33

R.I. Dep't of St., *Rhode Island Remote Online Notarization Temporary Performance Guide 2-3*,
 available at https://www.sos.ri.gov/assets/downloads/documents/RI-RON-guidance-
 document.pdf. .......................................................................................... 16, 32, 33

R.I. Exec. Order No. 20-09 (March 22, 2020),
 https://governor.ri.gov/documents/orders/Executive-Order-20-09.pdf. ................................. 2, 8

R.I. Exec. Order No. 20-11 (March 23,2020),
 https://governor.ri.gov/documents/orders/Executive-Order-20-11.pdf. ................................... 10

R.I. Exec. Order No. 20-27 (Apr. 17, 2020)
 https://governor.ri.gov/documents/orders/Executive-Order-20-27.pdf. ....... 2, 10, 12, 37, 38, 39

R.I. Exec. Order No. 20-50 (June 29,2020) https://governor.ri.gov/documents/orders/Executive-
 Order-20-50.pdf. ........................................................................................................ 8

R.I. Exec. Order No. 20-52 (July 3, 2020), https://governor.ri.gov/documents/orders/Executive-
 Order-20-52.pdf. .................................................................................................... 2, 8

*R.I. STATE BOARD OF ELECTIONS MINUTES OF MEETING*, ST. OF R.I. BD. OF ELECTIONS
 (March 26, 2020),
 https://opengov.sos.ri.gov/Common/DownloadMeetingFiles?FilePath=Minutes132202036212
 5.pdf. ....................................................................................................................... 10

*Registration Status of Voters in Rhode Island as of July 2020*, R.I. DEP'T OF ST. (accessed July
 18, 2020), https://datahub.sos.ri.gov/RegisteredVoter.aspx. ............................................. 18, 26

*Rhode Island Coronavirus Map and Case Count*, N.Y. TIMES,
 https://www.nytimes.com/interactive/2020/us/rhode-island-coronavirus-cases.html (last
 updated July 22, 2020). ................................................................................................. 7

*Rhode Island Remote Online Notarization Temporary Performance Guide 2–3*, R.I. DEP'T OF
 ST., available at https://www.sos.ri.gov/assets/downloads/documents/RI-RON-guidance-
 document.pdf. .......................................................................................................... 32

RI DEPARTMENT OF STATE, ALL ABOUT THE RHODE ISLAND PRESIDENTIAL PRIMARY: A GUIDE
 FOR ELIGIBLE VOTERS (JUNE 2, 2020) https://vote.sos.ri.gov/Content/Pdfs/June2PPPGuide.pdf.
 ................................................................................................................................. 30

Scott Souza, *Barrington Extends Coronavirus State of Emergency*, THE PATCH (July 6, 2020),
https://patch.com/rhode-island/barrington/barrington-extends-coronavirus-state-emergency... 8

*Standards of Conduct for Notaries Public in the State of Rhode Island and Providence
Plantations § 4(a)(3)* (effective Jan. 1, 2019), available at
https://sos.ri.gov/assets/downloads/documents/notary-standards-of-conduct-for-notaries-
amended.pdf.................................................................................................................. 16

The Associated Press, *1st COVID-19 case confirmed in Rhode Island*, BANGOR DAILY NEWS,
March 1, 2020, https://bangordailynews.com/2020/03/01/news/1st-covid-19-case-confirmed-
in-rhode-island/. (Accessed July 19, 2020)................................................................... 6

*Upcoming Elections*, ST. OF R.I. BD. OF ELECTIONS, (last visited July 22, 2020),
https://elections.ri.gov/elections/upcoming/. ............................................... 3, 14, 39

Verifying Authenticity of Absentee/Mailed Ballots," Voting Outside the Polling Place: Absentee,
All-Mail and other Voting at Home Options, Nat'l Conf. of State Legislatures (July 10, 2020),
...................................................................................................................................... 15

*Visitation Restrictions at Care New England Hospital*s, CARE NEW ENGLAND (June 24, 2020). 15

*Vote By Emergency Mail Ballot*, R.I. DEP'T OF ST., https://vote.sos.ri.gov/Voter/EmergencyBallot
(last accessed July 18, 2020)......................................................................................... 17

*Vote by Mail*, R.I. DEP'T OF ST.. https://vote.sos.ri.gov/Voter/VotebyMail?ActiveFlag=4 (last
accessed July 18, 2020).................................................................................................. 17

Weijia Jang, *Trump says pandemic will "get worse before it gets better,"* CBS NEWS (July 21,
2020), https://www.cbsnews.com/video/trump-says-pandemic-will-get-worse-before-it-gets-
better/#x. ......................................................................................................................... 8

Wendy R. Weiser & Harold Ekeh, *The False Narrative of Voter Fraud*, BRENNAN CTR. FOR
JUSTICE (Apr. 10, 2020) https://www.brennancenter.org/our-work/analysis-opinion/false-
narrative-vote-mail-
fraud..................................................................................................................18, 35

## EXHIBIT LIST

Declaration of Dr. Arthur Reingold ...................................................................Exhibit A
    Declaration of Expert
Declaration of Dr. Michael Fine ......................................................................Exhibit B
    Declaration of Expert
Declaration of Miranda Oakley ........................................................................Exhibit C
    Declaration of Plaintiff
Declaration of Barabara Monahan ....................................................................Exhibit D
    Declaration of Plaintiff
Declaration of Mary Baker ...............................................................................Exhibit E
    Declaration of Plaintiff
Declaration of Jane Koster................................................................................ Exhibit F
    Declaration of Plaintiff on Behalf of the League of Women Voters of Rhode Island
Declaration of John Marion ..............................................................................Exhibit G
    Declaration of Plaintiff on Behalf of Common Cause Rhode Island
Rhode Island Demographics Data .....................................................................Exhibit H
Table, U.S. Census 2018: ACS 5-year estimate data profile

## INTRODUCTION

Rhode Island, which took swift action in the early days of the COVID-19 pandemic to ensure its citizens could vote safely, today plans to enforce voting regulations that will require tens of thousands of its citizens to make an impossible choice between two irreparable harms– violating social distancing guidelines designed to protect them and their loved ones and foregoing their fundamental right to vote. At issue is Rhode Island's requirement that citizens who[1] vote by mail sign the certifying envelope which contains their ballot before a notary public or two witnesses (the "witness or notary requirement"). Plaintiffs' motion to enjoin the State's enforcement of the witness or notary requirement is not opposed by Defendant Secretary of State Nellie M. Gorbea. Yesterday, in the evening of July 22, 2020, counsel for Defendant Gorbea informed Plaintiffs by email that the Secretary of State "believes that there should not be any requirement of witnesses or notaries for mail ballots during this election period[,]" and "will not oppose [Plaintiffs'] request for injunctive relief."

In normal times the witness or notary requirement was an ineffectual policy, but burdened only the small percentage of voters who chose to vote by mail in a given election. Voters in many cases could simply satisfy the requirement without risking their health or the health of others. Of course, these are not normal times. The global pandemic, which has seen a resurgence in Rhode Island communities, makes interacting with others outside of one's household not only dangerous but a violation of State and Federal health guidelines. For the tens of thousands of Rhode Islanders without ready access to two witnesses or a notary in their homes, either voting in-person or seeking out two witnesses or a notary places their health at

---

[1] Subject to very limited exclusions not at issue here, *see infra* Factual Background Sec. F.

1

grave risk. Nearly a quarter of the State's voting age population—nearly 200,000 people, including one of the individual Plaintiffs and some members of the League of Women Voters of Rhode Island (the "LWVRI") and Common Cause Rhode Island ("CC-RI")—live by themselves. Hundreds of thousands of others do not live with a notary or two adults who may serve as witnesses.

The witness or notary requirement will require these eligible voters to do the opposite of what the State has demanded in the current public health emergency. Governor Gina M. Raimondo has declared a state of emergency,[2] urging citizens to "reduce the size of mass gatherings,"[3] and has continued to caution citizens to "[k]eep groups consistent and small."[4] Critically for this litigation, on April 17, 2020, Governor Raimondo suspended the witness or notary requirement challenged here in view of the inherent health risks posed, but only with respect to the State's June 2, 2020 presidential primary election.[5] Leading up to the June 2 presidential primary, Secretary of State Gorbea advised that "[v]oting from home is the safe and secure way to make your voice heard during the COVID-19 pandemic."[6]

But in the face of a resurgent virus, the State has declined to suspend the witness or notary requirement for its pending September and November elections, requiring many thousands of Rhode Island voters to disregard the State's own health and safety guidance and venture from the safety of their homes in order to vote. As explained by Plaintiffs' expert Dr.

---

[2] R.I. Exec. Order No. 20-52 (July 3, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-52.pdf.
[3] R.I. Exec. Order No. 20-09 (March 22, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-09.pdf.
[4] Press Release, *Rhode Island to Move to Phase 3 Tuesday, Governor Extends Executive Orders* (June 29, 2020), https://www.ri.gov/press/view/38720.
[5] R.I. Exec. Order No. 20-27 at 2 (Apr. 17, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-27.pdf.
[6] Press Release, *Secretary Gorbea to Rhode Islanders: Vote from Home this Week* (May 26, 2020), https://www.ri.gov/press/view/38424.

Arthur Reingold—Head of Epidemiology and Biostatistics at the University of California at Berkeley—person-to-person interaction continues to carry substantial risks of exposure to and/or transmission of COVID-19. Facing glaring contradictions between state health guidance and the few states that impose mail-in ballot witness requirements, three federal courts have enjoined the enforcement of substantially similar requirements in states that, unlike Rhode Island, did not waive the requirements ahead of primary elections held earlier this year.[7] Plaintiffs respectfully submit that they have done more than establish a substantial likelihood of success on the merits that their constitutionally-protected voting rights will be overburdened by the witness or notary requirement; the facts speak for themselves and Plaintiffs have proven their case.

Unless this Court enjoins the State from enforcing the witness or notary requirement, Rhode Island voters will face a choice between two immediate and irreparable harms: risk your health or forego your constitutional rights. The State will soon be conducting a primary and general election, and will need to prepare by printing ballots and ballot envelopes and educating voters. Applications for mail-in ballots must be received by the voter's local board by August 18, 2020 to be valid for the State's September 8, 2020 primary.[8] Only an immediate temporary restraining order and preliminary injunction from this Court will prevent irreparable harm to Plaintiffs.

Finally, the balance of the equities and the public interest tips decidedly in favor of a temporary restraining order and preliminary injunction, which will vindicate the dual public interests of ensuring all qualified voters can vote in September and November and protecting

---

[7] *See Thomas v. Andino*, 2020 U.S. Dist. LEXIS 90812 (D.S.C. May 25, 2020); *League of Women Voters of Va. v. Va. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 79439 at *1 (W.D. Va. May 5, 2020); *People First of Ala. v. Merrill*, 2020 U.S. Dist. LEXIS 104444 at *1 (N.D. Ala. June 15, 2020).
[8] *See Upcoming Elections*, St. of R.I. Bd. of Elections, (last visited July 22, 2020), https://elections.ri.gov/elections/upcoming/.

public health, with little if any harm to Defendants. This Court must evaluate the witness or notary requirement in light of the present and impending circumstances that Plaintiffs and other Rhode Island voters face. Without relief, thousands of Rhode Island voters will be forced to risk their health in order to vote—or simply not have their voices heard at all. Plaintiffs therefore request the Court grant a temporary restraining order and preliminary injunction enjoining Defendants from enforcing the witness or notary requirement for the State's pending September primary and November general elections.

## FACTUAL BACKGROUND

### A.  THE COVID-19 PANDEMIC

Tragically, the United States is the epicenter of the global COVID-19 pandemic and has far more confirmed COVID-19 cases than any other nation.[9] As Plaintiffs' expert Dr. Arthur Reingold explains in his Declaration, the novel coronavirus, SARS-CoV-2, causes individuals to contract COVID-19. Declaration of Dr. Arthur Reingold ¶ 7 (attached as Ex. A).[10] COVID-19 spreads mainly from person-to-person through close contact with one another and through respiratory droplets when an infected person coughs or sneezes.[11] COVID-19 "is aerosolized, such that tiny droplets containing the virus remain in the air and can be inhaled by others who

---

[9] *Covid-19 Dashboard by the Center for Systems Science and Engineering at Johns Hopkins University*, JOHNS HOPKINS U. CORONAVIRUS RESOURCE CENTER https://coronavirus.jhu.edu/map.html (last visited July 22, 2020) (reporting 3,925,025 confirmed cases in the United States, and 2,159,654 cases in Brazil (the country with the second-highest number of confirmed cases), as of July 22, 2020).

[10] Dr. Reingold is a medical doctor, a public health expert in the area of infectious diseases and epidemiology, and the Division Head of Epidemiology and Biostatistics at the University of California, Berkeley, School of Public Health. Reingold Decl. ¶¶ 1, 3. He spent eight years at the Centers for Disease Control and Prevention ("CDC"), has directed or co-directed the CDC-funded California Emerging Infections Program for more than 25 years, and was previously the President of both the Society for Epidemiologic Research and the American Epidemiological Society. *Id.* ¶ 1.

[11] *How COVID-19 Spreads,* CENTER FOR DISEASE CONTROL AND PREVENTION (last updated June 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

come into contact with that air." Reingold Decl. ¶ 9. Those infected with the virus may transmit

it to others even without showing symptoms themselves. *Id.* at 12.

COVID-19 can cause severe consequences, including long-term illness and death. *Id.* ¶ 7.

Globally, about 20% of COVID-19 patients "become ill enough to need supplemental oxygen or

even more advanced hospital care."[12] A study conducted in San Diego County, California found

that 10% of those confirmed to have contracted COVID-19 required hospital care.[13] By one

estimate, COVID-19 will be responsible for well over 200,000 deaths in the United States by

November 1, 2020.[14]

COVID-19 threatens to infect any individual no matter their age. Reingold Decl. ¶ 7.

Between February 1 and July 18, 2020, persons between 18 and 64 years old accounted for

75.9% of reported cases of COVID-19 in the United States.[15] During the week of July 11, 61.9%

of persons hospitalized were between 18 and 64 years old.[16] While people of all ages have

contracted and died from COVID-19, it is particularly fatal for older individuals. Reingold Decl.

¶ 7. Preliminary data shows a 5.6% mortality rate for individuals older than 65.[17] One study

found that patients older than 80 were twenty times more likely to die than persons in their 50s

---

[12] Donald G. McNeil Jr., *The Pandemic's Big Mystery: How Deadly is the Coronavirus?*, N.Y. TIMES (July 4, 2020), https://www.nytimes.com/2020/07/04/health/coronavirus-death-rate.html (last updated July 15, 2020).

[13] COUNTY OF SAN DIEGO HEALTH AND HUMAN SERVICES AGENCY, COVID-19 WATCH - WEEKLY COVID-19 SURVEILLANCE REPORT (July 14, 2020), available at https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/COVID-19%20Watch.pdf.

[14] *COVID-19 Projections*, THE INST. FOR HEALTH METRICS AND EVALUATION, https://covid19.healthdata.org/united-states-of-america (updating regularly) (last accessed July 22, 2020).

[15] *Demographic Trends of COVID-19 Cases and Deaths in the US Reported to CDC*, CENTER FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/covid-data-tracker/index.html#demographics (last updated July 22, 2020).

[16] *COVID-NET: A Weekly Summary of U.S. COVID-19 Hospitalization Date: COVID-19 Laboratory-Confirmed Hospitalizations*, CENTER FOR DISEASE CONTROL AND PREVENTION, https://gis.cdc.gov/grasp/COVIDNet/COVID19_5.html (last visited July 21, 2020).

[17] Fransisco Perez-Saez et al., *Serology-informed Estimates of SARS-COV-2 Infection Fatality Risk in Geneva, Switzerland*, OSF PREPRINTS , https://osf.io/wdbpe/ (last updated June 15, 2020) (data is based on a study of COVID-19 mortality in Geneva, Switzerland).

and hundreds of times more likely to die than those below forty.[18] COVID-19 also poses greater

risks for people with preexisting heart and respiratory conditions including asthma, individuals

with compromised immune systems, and those with many other preexisting health conditions.

Reingold Decl. ¶ 7. Those with disabilities may be at higher risk. The CDC cautions that,

although disability alone may not be related to higher risk of contracting COVID-19, some

people with disabilities might be at a higher risk of infection or severe illness because of

underlying chronic medical conditions such as chronic lung disease, a serious heart condition, or

a weakened immune system.[19]

## B. THE SPREAD OF COVID-19 IN RHODE ISLAND

On March 1, 2020, Rhode Island public health officials confirmed its first case of

COVID-19 in the state.[20] As of July 22, 2020, there have been 3,882,167 confirmed cases of

COVID-19 and 141,677 deaths attributed to COVID-19 in the United States, according to the

Centers for Disease Control and Prevention ("CDC").[21] Rhode Island has had 17,986 confirmed

cases and 996 deaths.[22] These figures almost certainly understate the real numbers of COVID-19

victims, given the limitations in testing.

The seven day average for new reported cases of COVID-19 in Rhode Island peaked in

late April 2020 and, as a result of swift and strong social distancing measures, steadily declined

---

[18] Katherine J. Wu, *Study of 17 Million Identifies Crucial Risk Factors for Coronavirus Deaths*, N.Y. TIMES, https://www.nytimes.com/2020/07/08/health/coronavirus-risk-factors.html (last updated July 17, 2020).
[19] *See People with Disabilities*, CENTER FOR DISEASE CONTROL AND PREVENTION (April 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html.
[20] The Associated Press, 1st COVID-19 case confirmed in Rhode Island, BANGOR DAILY NEWS, March 1, 2020, https://bangordailynews.com/2020/03/01/news/1st-covid-19-case-confirmed-in-rhode-island/. (Accessed July 19, 2020).
[21] *Cases in the US*, CENTER FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated July 22, 2020).
[22] *Id.*

through the end of June.[23] However, over the last two weeks the seven day average has increased

from 35 on July 1, 2020 to 60 on July 22.[24] On July 13, Rhode Island reported 175 new cases.[25]

Plaintiffs' local expert, Dr. Fine, is a former Director of the Rhode Island Department of Health,

as well as the former Physician-in-Chief of the Rhode Island and Miriam Hospitals' Departments

of Family and Community Medicine. *See* Declaration of Michael Fine ¶ 2 (attached as Ex. B).

He has witnessed new outbreaks in Central Falls and Pawtucket, with the number of positive

COVID-19 cases identified at local health facilities rising around 1 or 2 per day in early July to

more than 20 positive tests per day on July 16 and July 17. *Id.* ¶ 8.

  The recent increase in reported cases in Rhode Island occurs in a national context where,

as of July 19, 2020, 39 states and the District of Columbia are seeing an increase in the rate of

reported new cases, while nine states are holding steady and only two are experiencing a

decrease.[26] A document prepared for the White House Coronavirus Task Force dated July 14,

2020 recommends that 18 states in the coronavirus "red zone" should roll back reopening

measures amid surging cases.[27] As of July 21, 2020 thirteen states are pausing the reopening of

their economies, while nine states are re-closing.[28] Acknowledging this reality, on July 21, 2020

the President of the United States told Americans the pandemic will "get worse before it gets

---

[23] *Rhode Island Coronavirus Map and Case Count*, N.Y. TIMES,
https://www.nytimes.com/interactive/2020/us/rhode-island-coronavirus-cases.html (last updated July 22, 2020).
[24] *Id.*
[25] *Id.*
[26] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES,
https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (accessed July 19, 2020).
[27] *See* Betsy Klein, *Task force report says 18 states in coronavirus 'red zone' should roll back reopening*, CNN (July 17, 2020) https://www.cnn.com/2020/07/17/politics/white-house-states-hot-spots-task-force/index.html. The "red zone" is defined in the 359-page report as "those core-based statistical areas (CBSAs) and counties that during the last week reported both new cases above 100 per 100,000 population, and a diagnostic test positivity result above 10%."
[28] *See* Jasmine C. Lee et al., *See How All 50 States Are Reopening (and Closing Again)*, N.Y. TIMES,
https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html (last updated July 21, 2020).

better."[29] As the recent uptick in Rhode Island demonstrates, Rhode Island is not immune from these larger trends in the United States and strict social distancing measures are crucial to maintain Rhode Island's progress in fighting COVID-19.

### C. THE PUBLIC HEALTH RESPONSE TO COVID-19

Recognizing the need for social distancing in order to reduce the spread of COVID-19, Rhode Island Governor. Raimondo issued an Executive Order on March 9, 2020 declaring a state of emergency which has been extended at least through August 2, 2020.[30] Governor Raimondo's July 3, 2020 executive order extending the state of emergency acknowledged that "aggressive and sustained efforts are still necessary to slow the spread of the COVID-19 virus and to lessen the strain on our healthcare system."[31] Local leaders agree, as evidenced by the various localities in Rhode Island that have likewise declared states of emergency that remain in effect.[32]

Shortly after declaring a state of emergency, Governor Raimondo issued an executive order announcing that the Rhode Island Department of Health "determined that it is necessary to further reduce the size of mass gatherings."[33] Governor Raimondo has since eased restrictions on the maximum permissible size for public gatherings.[34] However, Governor Raimondo has cautioned that citizens should continue to avoid mass gatherings.[35] She explained that "the lower the attendance and gathering size, the lower the risk."[36] She also explained that all vulnerable

---

[29] Weijia Jang, *Trump says pandemic will "get worse before it gets better*," CBS NEWS (July 21, 2020), https://www.cbsnews.com/video/trump-says-pandemic-will-get-worse-before-it-gets-better/#x.

[30] R.I. Exec. Order No. 20-52 (July 3, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-52.pdf.

[31] *Id.* at 2.

[32] *See, e.g.,* Scott Souza, *Barrington Extends Coronavirus State of Emergency*, THE PATCH (July 6, 2020), https://patch.com/rhode-island/barrington/barrington-extends-coronavirus-state-emergency.

[33] R. I. Exec Order No. 20-09 (March 22, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-09.pdf.

[34] R.I. Exec. Order No. 20-50 (June 29, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-50.pdf.

[35] *Id.*

[36] *Id.*

populations, including persons 65 years or older, "are still strongly advised to stay at home[.]"[37]
Governor Raimondo emphasized that a key message for the public is to "[k]eep groups
consistent and small."[38]

This Court has likewise acknowledged the need for continued public health measures to
address the COVID-19 pandemic and has acted accordingly. "In light of the continued guidance
from the Centers for Disease Control and other health authorities and given the continued
escalation of the COVID-19 pandemic," this Court remains closed to the public and has continued
to encourage its employees to maximize telework per an order set to remain in effect until at least
September 30, 2020, a date more than three weeks after the September primary election.[39]
Recognizing that it is unlikely a vaccine will be available to the public at large before mid-2021,
Reingold Decl. ¶ 14, social distancing measures including maintaining at least six feet of space
between people (as well as consistent hygiene practices) are the only known effective measures
for protecting against transmission of COVID-19. *Id.* ¶ 11. Some scientists have expressed anxiety
that Rhode Island may experience a resurgence in COVID-19 cases in the fall as children return
to school and people spend more time indoors.[40]

## D. RHODE ISLAND'S SUSPENSION OF THE WITNESS OR NOTARY REQUIREMENT FOR THE PRESIDENTIAL PRIMARIES

Witnessing the spread of COVID-19 in Rhode Island and elsewhere, State public officials
responded to these serious public health dangers and the need to provide Rhode Island citizens

---

[37] *Id.*

[38] Press Release, *Gina Raimondo, Governor of Rhode Island, Rhode Island to Move to Phase 3 Tuesday, Governor Extends Executive Orders* (June 29, 2020), https://www.ri.gov/press/view/38720.

[39] *Fourth General Order Regarding Continuity of Operations During Coronavirus Pandemic* (D.R.I. June 29, 2020), https://www.rid.uscourts.gov/sites/rid/files/FourthGeneralOrderOperations.pdf.

[40] G. Wayne Miller, *R.I. Faces Uncertain COVID-19 Prognosis for Fall*, PROVIDENCE JOURNAL (July 19, 2020), https://www.providencejournal.com/news/20200718/ri-faces-uncertain-covid-19-prognosis-for-fall.

with a safe and accessible means of voting for the June presidential primary election. On March

23, 2020, Governor Raimondo issued Executive Order 20-11, which delayed the primary

election to June 2, 2020 and prepared for a "predominantly mail ballot election."[41] The Order

acknowledged that "minimizing contact between individuals, including those who would

ordinarily vote at a polling place, will help slow the spread of COVID-19."[42] On March 26, 2020

the State Board of Elections voted to suspend the signature requirement for mail ballots,

acknowledging that the requirements "necessitate[] close contact between the voter and other

people, which is a known cause of transmitting COVID-19."[43] On April 17, 2020 Governor

Raimondo issued Executive Order 20-27, which suspended the witness or notary requirement

challenged here for the June 2, 2020 presidential primary election.[44] The Governor instructed the

Board of Elections to "take all measures necessary to compare and authenticate the signatures set

forth on the application and certification envelopes" and permitted them to "request mail ballot

applicants to voluntarily provide the last four digits of the voter's Social Security number or a

valid driver's license number."[45]

     The State also advised and encouraged its citizens to exercise their right to vote by mail,

to minimize the risk to themselves and their fellow citizens. In May, Defendant Gorbea was

"encouraging everybody to just vote by mail[.]"[46] Defendant Gorbea later advised that "[v]oting

from home is the safe and secure way to make your voice heard during the COVID-19

---

[41] R.I. Exec. Order No. 20-11 (March 23, 2020) https://governor.ri.gov/documents/orders/Executive-Order-20-11.pdf, (March 23, 2020).

[42] *Id.*

[43] *R.I. STATE BOARD OF ELECTIONS MINUTES OF MEETING*, ST. OF R.I. BD. OF ELECTIONS (March 26, 2020), https://opengov.sos.ri.gov/Common/DownloadMeetingFiles?FilePath=\Minutes\132\2020\362125.pdf.

[44] R.I. Exec. Order No. 20-27, 2 (Apr. 17, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-27.pdf.

[45] *Id.*

[46] Erica Ponte, *RI Secretary of State encourages mail ballot voting in presidential primary*, WPRI (May 14, 2020), https://www.wpri.com/news/elections/ri-secretary-of-state-encourages-mail-ballot-voting-in-presidential-primary/.

pandemic."[47] In its presidential primary "guide for eligible voters," the Secretary of State's office told voters that voting by mail is "the best ways for RI voters to follow social distancing best practices."[48]

The State's measures to protect Rhode Island voters were in accord with guidelines issued by the CDC on June 22, 2020 concerning voting during the COVID-19 pandemic. Under "Guiding Principles," the CDC states that "[e]lections with only in-person voting on a single day are higher risk for COVID-19 spread because there will be larger crowds and longer wait times."[49] The CDC recommends that voters "[c]onsider voting alternatives . . . that minimize contact."[50] It notes that alternative voting mechanisms can reduce the transmission of COVID-19.[51]

The suspension of the witness or notary requirement for the June presidential preference primary was successful. 83% of Rhode Island voters exercised their fundamental right to vote via mail-in ballot.[52] Voting by mail was used most extensively by older voters, which allowed the

---

[47] Press Release, *Nellie Gorbea, Secretary of State of Rhode Island, Secretary Gorbea to Rhode Islanders: Vote from Home this Week* (May 26, 2020) https://www.ri.gov/press/view/38424.

[48] *All About the Rhode Island Presidential Primary: A Guide for Eligible Voters*, R.I. SEC'Y OF ST. (JUNE 2, 2020), https://vote.sos.ri.gov/Content/Pdfs/June2PPPGuide.pdf.

[49] *Considerations for Polling Locations*, CENTER FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).

[50] *Id.*

[51] *Id.*

[52] *2020 Presidential Primary Elections Task Force Preliminary Overview 3* (July 1, 2020); *see also 2020 Presidential Preference Primary Statewide Summary*, ST. OF R.I. BD. OF ELECTIONS (updated July 2, 2020), https://www.ri.gov/election/results/2020/presidential_preference_primary/#.

age cohorts most vulnerable to COVID-19 to vote in safety.[53] In comparison, less than 4% of the votes in the May 2016 presidential preference primary were cast by mail.[54]

Following the successful presidential primary election, Defendant Gorbea established the 2020 Presidential Primary Election Task Force ("Election Task Force" or "ETF"). On July 9, 2020, the Election Task Force released recommendations for how to minimize the risk of COVID-19 transmission during the elections.[55] The ETF recommended a variety of measures to make it easier to cast ballots by mail and more efficiently process mail ballots.[56] A presentation published by the Election Task Force that same day reflected that "[r]emoving the two witness/notary signature requirement on ballots made it easier for older Rhode Islanders and those living alone" to vote safely.[57] As a result of these measures, the ETF concluded that the Governor's executive order was a success and led to a "[d]ecreased number of in-person voters [which] allowed for social distancing best practices."[58]

After concluding that removing the witness or notary requirement had been a success, the Election Task Force proposed that Rhode Island adopt the same course for the September and November 2020 elections. The ETF stated that adopting this change would "[e]nsure[] voters who live alone or with one other person do not have to rely on someone else in order to cast a ballot."[59] The ETF also acknowledged that the "[m]ajority of states do not have a witness or

---

[53] *2020 Presidential Primary Election Task Force Presentation*, R.I. DEP'T OF ST. (July 9, 2020), https://vote.sos.ri.gov/Content/Pdfs/PPP%20Task%20Force%20July%209%202020%20Final.pdf (stating that voting by mail "protected our most vulnerable populations[.]").

[54] *2016 Presidential Primary Statewide Summary*, ST. OF R.I. BD. OF ELECTIONS, https://www.ri.gov/election/results/2016/presidential_preference_primary/# (last updated May 4, 2016) (click on "Show mail ballot breakout").

[55] Press Release, *Office of the Secretary of State, Task Force Releases Recommendations for Safe and Secure Fall Elections in Rhode Island* (July 9, 2020), https://www.ri.gov/press/view/38803.

[56] *Id.*

[57] *2020 Presidential Primary Election Task Force Presentation* 4.

[58] *Id.*

[59] *Id.* at 10.

notary requirement," with most states instead predominantly relying on signing under oath and signature matching to confirm voter identification, as Rhode Island did for the June election.[60]

On June 30, 2020, the Voting Access Coalition, an alliance of organizations in the state promoting the exercise of the franchise and fairness in elections, formally requested that the Governor waive the witness or notary requirement for the State's upcoming primary and general elections.[61] To date Governor Raimondo has not responded, nor has she acted to suspend the witness or notary requirement. Defendant Gorbea promoted legislation to implement mail-in voting for the remaining 2020 elections, including a provision to eliminate the witness or notary requirement.[62] However, the Rhode Island General Assembly failed to pass this legislation with its opponents largely citing the provision of the legislation which would have required applications for mail-in ballots to be sent to every registered voter.[63] The General Assembly, however, has passed other legislation clearly demonstrating that they understand the public health risks of in-person contact at this time, for example eliminating the in-person registration requirement for the Rhode Island's mobile sports betting app.[64]

---

[60] *Id.*; *see also* R. I. Exec. Order 20-27, 2 (Apr. 17, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-27.pdf.
[61] Letter to Governor Raimondo, R.I. ACLU (June 30, 2020), http://riaclu.org/images/uploads/VAC_letter_to_Governor_FINAL_20200630.pdf.
[62] Alexandra Leslie & Melanie DaSilva, *RI secretary of state announces legislation for mail-based voting in the fall*, WPRI (June 12, 2020), https://www.wpri.com/news/elections/r-i-secretary-of-state-set-to-introduce-legislation-for-mail-based-voting-in-the-fall/.
[63] *See, e.g.,* Parker Gavigan, *A battle over mail ballots*, WJAR (July 17, 2020), https://turnto10.com/i-team/battle-over-mail-ballots; Ted Nesi, *House leaders back bill to send all RI voters mail ballot applications*, WPRI (July 14, 2020), https://www.wpri.com/news/politics-government/house-leaders-back-bill-to-send-all-ri-voters-mail-ballot-applications/.
[64] *Lawmakers drop in-person requirement for online sports wagering*, State of RI General Assembly (July 16, 2020), http://www.rilin.state.ri.us/pressrelease/_layouts/RIL.PressRelease.ListStructure/Forms/DisplayForm.aspx?List=c8baae31-3c10-431c-8dcd-9dbbe21ce3e9&ID=370997.

### E.  RHODE ISLAND'S UPCOMING PRIMARY AND GENERAL ELECTIONS

Rhode Island will hold two statewide election days in the remaining part of 2020. Primary elections for offices including U.S. House of Representatives, Rhode Island Senate, and Rhode Island House of Representatives will be held on September 8, 2020.[65] The general Presidential election, and the election for U.S. Senate, U.S. House of Representatives, Rhode Island Senate, Rhode Island House of Representatives, and municipal offices will be held on November 3, 2020.[66]

Voters' applications for mail-in ballots must be received by the local board 21 days before the election to be counted. R.I. Gen. Laws § 17-20-2.1(c). While a voter may apply for an emergency ballot up to the day before the election, such ballots are available only to voters who become eligible to vote by mail ballot "on account of circumstances manifested twenty (20) days or less prior to" the election. *Id.* § 17-20-2.2(a), (b). For the vast majority of Rhode Island voters eligible to vote by mail, they must apply for absentee ballots by August 18, 2020 and October 13, 2020 for the State primary and general election, respectively.[67]

### F.  RHODE ISLAND'S MAIL BALLOT PROCESS AND THE CHALLENGED WITNESS OR NOTARY REQUIREMENT

Rhode Island law provides four circumstances under which a qualified elector may vote by mail. Voters confined to a hospital or nursing home may have their ballot witnessed by a pair of bi-partisan state supervisors.[68] For voters living abroad and/or serving out-of-state in the

---

[65] *See Upcoming Elections*, ST. OF R.I. BD. OF ELECTIONS, (last visited July 22, 2020), https://elections.ri.gov/elections/upcoming/.
[66] *Id.*
[67] *Id.*
[68] If the voter is voting by mail because they are "confined in any hospital, convalescent home, nursing home, rest home, or similar institution, public or private, within the State of Rhode Island," R.I. Gen. Laws § 17-20-2(2), the

military, there is no witness or notary requirement.[69] Voters who qualify to vote by mail under either of the remaining two circumstances must sign the certifying envelopes which contain their ballots before a notary public or two witnesses.

      a.  If the voter is voting by mail because they are "incapacitated to the extent that it would be an undue hardship to vote at the polls because of illness, or mental or physical disability, blindness, or serious impairment of mobility," R.I. Gen. Laws § 17-20-2(1), "the signature on the certifying envelopes containing a voted ballot must be made before a notary public or two (2) witnesses who shall set forth their addresses on the form." R.I. Gen. Laws § 17-20-2.1(d)(1).

      b.  If the voter is voting by mail because they "may not be able to vote at his or her polling place in his or her city or town on the day of the election," R.I. Gen. Laws § 17-20-2(4), the signature on all certifying envelopes containing a voted ballot must be made before a notary public, or other person authorized by law to administer oaths where signed, or where the elector voted, or before two (2) witnesses who shall set forth their addresses on the form," R.I Gen. Laws § 17-20-2.1(d)(4).

Rhode Island voters voting by emergency mail ballot must also comply with the witness or notary requirement. *Id.* § 17-20-2.2(d)(1).[70] Voters are eligible for an emergency mail ballot if they become eligible to vote by mail ballot for any of the aforementioned reasons "on account of circumstances manifested twenty (20) days or less prior to" the election. *Id.* § 17-20-2.2(a).

---

ballot "must be witnessed by the state supervisors" who travel in bipartisan pairs to each of the aforementioned facilities within twenty days before the election, R.I. Gen. Laws § 17-20-14(a).

[69] If the voter is voting by mail because they "will be temporarily absent from the state because of employment or service intimately connected with military operations or who is a spouse or legal dependent residing with that person; or a United States citizen that will be outside of the United States," R.I. Gen. Laws § 17-20-2(3)-(4), there is no notarization or witnessing requirement, R.I. Gen. Laws § 17-20-2.1(d)(3).

[70] The State Legislature has also failed to address the witness or notary requirement. On July 17, 2020 the Legislature transmitted to the Governor H 8102A and S 2598A, which permit emergency mail ballots applications to be processed at a voter's board of canvassers in person on electronic poll pads.[70] The bill does not address the State's witness or notary requirement for mail-in ballots.[70] Another bill that passed in the State Legislature, H 7200A, would have provided mail-in ballots to all Rhode Island voters for the September and November Elections. However, the State Senate did not vote on the bill.

Rhode Island is only one of twelve states with a witness or notarization requirement,[71] and is one of only three states requiring two witnesses.[72]

The two witnesses or the notary for each ballot must actually witness the voter marking the ballot. R.I. Gen. Laws §§ 17-20-21 and 17-20-23. The Standards of Conduct for Notaries Public in the State of Rhode Island provide that voters may not notarize a document where the principal is the spouse, domestic partner, parent, guardian, child or sibling of the notary, including in-law, step, or half relatives.[73] On April 8, 2020, Defendant Gorbea authorized electronic notarizations for the duration of the state of emergency.[74] Among other requirements, in order to utilize electronic notarization for a mail ballot the voter must have an internet connection and be able to connect to the notary via approved video conference software, provide either two forms of ID or the oath of a credible witness as to who they are, sign the envelope in the video "presence" of the notary, and then, mail the document to the Notary for stamping and return to the voter by mail, before forwarding it to the Board of Elections by Election Day, and pay any required fee, up to $5.00 per notarized document.[75]

Some of the State's guides for eligible voters on how to vote by mail do not reference the witness or notary requirement. For instance, the State Board of Elections website provides that

---

[71] *See* Chart, "Verifying Authenticity of Absentee/Mailed Ballots," Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options, Nat'l Conf. of State Legislatures (July 10, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

[72] *See* Ala. Code §§ 17-11-7, 17-11-10; N.C. Gen. Stat. Ann. § 163-231(a). While North Carolina generally requires either two witnesses or a notary to witness mail-in ballots, the state has lessened this requirement to one witness for elections in 2020 in light of the COVID-19 pandemic. *See* N.C. Session Law 2020-17 §1(a).

[73] See Standards of Conduct for Notaries Public in the State of Rhode Island and Providence Plantations § 4(a)(3) (effective Jan. 1, 2019), available at https://sos.ri.gov/assets/downloads/documents/notary-standards-of-conduct-for-notaries-amended.pdf.

[74] Mark Reynolds, *R.I. Approves Electronic Notarization During Coronavirus Outbreak*, PROVIDENCE JOURNAL (April 6, 2020), https://www.providencejournal.com/news/20200406/ri-approves-electronic-notarization-during-coronavirus-outbreak.

[75] *See* R.I. Dep't of St., *Rhode Island Remote Online Notarization Temporary Performance Guide 2-3*, available at https://www.sos.ri.gov/assets/downloads/documents/RI-RON-guidance-document.pdf.

"[i]f you may not be able to get to the polls on Election Day, you can fill out a mail ballot application and receive a mail ballot."[76] The website makes no mention of the witness or notary requirement. Similarly, the Secretary of State's website provides step by step instructions on applying for and returning a mail ballot.[77] However, the website is silent with regards to the witness or notary requirement. The requirement that a mail ballot certificate be witnessed by two individuals or a notary is noted only on a separate page related to emergency mail ballots.[78] As a result, some voters new to voting by mail may only learn of the witness or notary requirement when they receive their ballot and prepare to cast it, making compliance on such a short time frame while social distancing even more difficult.

### G. RHODE ISLAND'S LAWS SUPPORTING ELECTION INTEGRITY FOR VOTING BY MAIL

In addition to the witness or notary requirement, Rhode Island has a number of different laws designed to promote the integrity of mail-in ballot procedures. First, mail-in ballots are assessed to ensure that the name, residence, and signature on the ballot itself all match that same information on the ballot application, including ensuring "that both signatures are identical." R.I. Gen. Laws 17-20-26(c)(2).

Second, Rhode Island also has stringent criminal provisions discouraging and penalizing misuse of mail-in ballots. In the rare case someone were to vote fraudulently, it is a felony in

---

[76] *Mail Ballot*, ST. OF R.I. BD. OF ELECTIONS, https://elections.ri.gov/voting/mailballot.php (last accessed July 18, 2020).

[77] *Vote by Mail*, R.I. DEP'T OF ST.. https://vote.sos.ri.gov/Voter/VotebyMail?ActiveFlag=4 (last accessed July 18, 2020).

[78] *Vote By Emergency Mail Ballot*, R.I. DEP'T OF ST., https://vote.sos.ri.gov/Voter/EmergencyBallot (last accessed July 18, 2020). The "emergency mail ballot" provisions apply to voters who become eligible to vote by mail within twenty days of an election. R.I. Gen. Laws § 17-20-2.2(a).

Rhode Island, punishable by up to ten years of imprisonment with a fine between $1,000 and $5,000. R.I. Gen. Laws §§ 17-23-4 & 17-26-1.

These anti-fraud measures work. Rhode Island's experience with mail-in voting is consistent with the experience of other states, which have found instances of voter fraud exceedingly rare. A comprehensive nationwide analysis found 491 cases of absentee voting fraud from 2000 to 2012—a minuscule fraction of all mail-in ballots cast during that period.[79] The study determined that an American is more likely to be struck by lightning than to cast a fraudulent mail-in ballot.[80] The Heritage Foundation, which maintains a comprehensive database of allegedly proven instances of voter fraud since 1979, lists no examples of voter fraud in Rhode Island.[81]

## H. THE PUBLIC HEALTH AND DISENFRANCHISEMENT CONSEQUENCES OF RHODE ISLAND'S WITNESS OR NOTARY REQUIREMENT DURING THE COVID-19 PANDEMIC

For "individuals without another person able to witness in their household, the requirement that they have someone witness their absentee ballot would place them at increased risk of exposure to and/or transmission of COVID-19." Reingold Decl. ¶ 23. This is because coming into "close enough proximity to witness their ballot would place them at increased risk of infection," and "would be particularly risky for those who are at a greater risk of complications and death from COVID-19." *Id.* And for public health purposes, "to prevent increasing the scope of the outbreak of COVID-19, we must assume that anyone could be infected and infect another person." *Id.* ¶ 12.

---

[79] Wendy R. Weiser & Harold Ekeh, *The False Narrative of Voter Fraud*, BRENNAN CTR. FOR JUSTICE (Apr. 10, 2020) https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud.
[80] *Id.*
[81] *A Sampling of Recent Election Fraud Cases from Across the United States*, HERITAGE FOUND. (accessed July 17, 2020), https://www.heritage.org/voterfraud.

Data from the U.S. Census Bureau confirms that a large portion of the Rhode Island electorate lives alone. As of 2018, 197,000 Rhode Islanders over the age of 18, 23.45% of the State's voting-age population, live alone.[82] Another 289,000 Rhode Islanders of voting age live with only one other person.[83] Of the 197,000 Rhode Islanders of voting age who live alone, an estimated 59,000 are aged 65 and older, accounting for 37.82% of all those aged 65 and over in Rhode Island.[84] For Rhode Islanders of voting age with a disability, an estimated 42,000, or 42%, live alone.[85] Assuming that these numbers apply roughly evenly across Rhode Island's 791,284 registered voters,[86] this means roughly 185,556 Rhode Island voters live alone. In Rhode Island's 2018 general election, 381,267 voters[87] cast ballots, meaning roughly 89,407 of those voters lived alone.

## I.  INJURIES AND IRREPARABLE HARM TO PLAINTIFFS

Individual Plaintiff Miranda Oakley is a registered Rhode Island voter who regularly votes in Rhode Island elections and wishes to vote in the upcoming primary election on September 8, 2020 and general election on November 3, 2020. Declaration of Miranda Oakley ¶ 4 (attached as Ex. C). Following the recommendations of the Rhode Island Department of Health and the State's Election Task Force, she wishes to vote by mail because of the risk of COVID-19 transmission from voting in person. *Id.* ¶¶ 10, 12. Ms. Oakley will have to violate social distancing guidelines to have her ballot witnessed and counted, as she does not live with two

---

[82] *See* U.S. Census 2018: ACS 5-year estimate data profile concerning Rhode Islanders' household size, broken down by age group, race, and disability status (attached at Ex. H).  This table was downloaded using the CPS Table Creator, available at https://www.census.gov/cps/data/cpstablecreator.html (accessed July 18, 2020).
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Registration Status of Voters in Rhode Island as of July 2020*, R.I. DEP'T OF ST. (accessed July 18, 2020), https://datahub.sos.ri.gov/RegisteredVoter.aspx.
[87] *See* Elections Data-Voter Turnout, RHODE ISLAND DEPARTMENT OF STATE (Accessed 7/22/2020), https://vote.sos.ri.gov/DataInformation/VoterTurnout.

eligible individuals who may serve as witnesses. *Id.* ¶ 2. If she leaves her home to vote in-person,

she risks not only her own health, but also the health of her elderly grandmother. *Id.* ¶ 7. Voting

in person would also expose her mother, who works with the elderly, both because of the risk

that Ms. Oakley will contract the virus, and because Ms. Oakley is blind and will need her

mother to drive her to the polls. *Id.* ¶ 7, 10.

Individual Plaintiff Barbara Monahan is also a registered Rhode Island voter who

regularly votes in Rhode Island elections and wishes to vote in the upcoming primary election on

September 8, 2020 and general election on November 3, 2020. Declaration of Barbara Monahan

¶ 3 (attached as Ex. D). Because of her advanced age, she is at high risk of becoming severely ill

or dying if she contracts COVID-19. *Id.* ¶ 8. Following public health recommendations, she

wishes to vote by mail because of the risk of COVID-19 transmission from voting in person. *Id.*

¶ 10. Ms. Monahan lives alone, and will have to violate social distancing guidelines to have her

ballot witnessed and counted. *Id.* ¶¶ 9, 12. She does not have access to a computer or a video call

service of any kind. *Id.* ¶ 11.

Individual Plaintiff Mary Baker is another registered Rhode Island voter who regularly

votes in Rhode Island elections and wishes to vote in the upcoming primary election on

September 8, 2020 and general election on November 3, 2020. Declaration of Mary Baker ¶ 3

(attached as Ex. E). Ms. Baker is at high risk of becoming severely ill or dying if she contracts

COVID-19, due to numerous health conditions including asthma, apnea, hypertension, diabetes,

and obesity. *Id.* ¶¶ 4, 7. Following public health recommendations, she wishes to vote by mail

because of the risk of COVID-19 transmission from voting in person. *Id.* ¶¶ 11, 12.

Plaintiff League of Women Voters of Rhode Island has a mission of encouraging

informed and active participation in government, and influencing public policy through

education and advocacy. Declaration of Jane Koster ¶ 3 (attached as Ex. F). The League has 150 members across Rhode Island. *Id.* Some of these members, like Individual Plaintiffs, wish to preserve their health by voting in the September primary and November general election by mail-in ballot but will be unable to do so without violating social distancing guidelines to have their ballot witnessed. *Id.* ¶ 8. This is a particular risk for certain of these League members, who are older than 60 years old (approximately 75% of the League's membership) and/or have underlying health conditions that put them at greater risk for serious injury or death from COVID-19. *Id.* Dealing with the implications of the witness or notary requirement has also caused, and will continue to cause, the League to divert resources from other core activities such as voter registration, voter education, and voter mobilization activities to try to educate voters about the witness requirement should it remain in place *Id.* ¶ 10.

Plaintiff Common Cause Rhode Island has a mission of promoting representative democracy by ensuring open, ethical, accountable, effective government processes at local, state and national levels by educating and mobilizing citizens. Declaration of John Marion ¶ 3 (attached as Ex. G). CC-RI has 5,800 members across Rhode Island. *Id.* Some of these members, like a 66-year-old resident of Cranston, Rhode Island, live alone and, like Individual Plaintiffs, they wish to preserve their health by voting in the September primary and November general elections by mail-in ballot but will be unable to do so without violating social distancing guidelines to have their ballot witnessed. *Id*. ¶ 8, 9. Many of CC-RI's members are particularly vulnerable to COVID-19 either due to their age or other underlying health conditions. *Id.* Others live in households with individuals particularly vulnerable to COVID-19. *Id*. Some of these members live by themselves or with only one other non-notary person. *Id.* Many of these members will become disenfranchised because of the witness or notary requirement. *Id.* at 8.

21

Dealing with the implications of the witness requirement has also caused, and will continue to cause, CC-RI to divert resources from other core activities such as voter registration, voter education, and voter mobilization activities to try to educate voters about the witness requirement should it remain in place *Id.* ¶ 11.

## ARGUMENT

In determining whether to grant a preliminary injunction, the court must find (1) a substantial likelihood of success on the merits; (2) a significant risk of irreparable harm if the injunction is withheld; (3) the harm to plaintiff outweighs the harm defendants would suffer in the absence of an injunction; and (4) an injunction will not adversely affect the public interest. *See Sallaj v. United States Immigration & Customs Enf't*, U.S. Dist. LEXIS 72857, *6 (D.R.I. 2020). Of the four factors, the likelihood of success on the merits is weighted most heavily. *See Wine and Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 46 (1st Cir. 2005). Plaintiffs need not establish a certainty of success, but they must show a "strong likelihood that [they] will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (*quoting Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

### A. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR CONSTITUTIONAL CLAIM BECAUSE THE WITNESS OR NOTARY REQUIREMENT UNDULY BURDENS THE RIGHT TO VOTE UNDER THE PRESENT CIRCUMSTANCES

The Fourteenth Amendment safeguards the "precious" and "fundamental" right to vote. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). The Equal Protection Clause prohibits any encumbrance on the right to vote that is not adequately justified by a valid state interest. *See Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992).

22

Plaintiffs are highly likely to succeed on their claims because the First and Fourteenth Amendments do not permit a state to deprive tens of thousands of its qualified citizens of the right to vote by maintaining a requirement that runs counter to public health guidance and does little, if anything, to promote election integrity. Because the unconstitutional burden placed on plaintiffs by the State's witness or notary requirement is severe and widespread, the Court should apply heightened, if not strict, scrutiny. This Court should follow other courts finding that similar requirements during a global pandemic impose an unconstitutional burden on a citizen's right to vote. *See, e.g., Thomas v. Andino*, Civil Action No. 3:20-cv-01552-JMC, 2020 U.S. Dist. LEXIS 90812 (D.S.C. May 25, 2020); *League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV-00024, 2020 U.S. Dist. LEXIS 79439 (W.D. Va. May 5, 2020). The requirement would not, however, pass even rational basis scrutiny.

## 1.   THE ANDERSON-BURDICK FRAMEWORK

As the Supreme Court set forth in *Anderson v. Celebrezze* and *Burdick v. Takushi,* courts must balance the character and magnitude of any law burdening the right to vote against the relevant government interest served by the law. *Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983)). The First Circuit describes the application of the *Anderson-Burdick* framework as follows:

> the U.S. Supreme Court has developed a flexible "sliding scale" approach for assessing the constitutionality of such restrictions. Under this approach, when the burden imposed by a ballot access regulation is heavy, the provision must be narrowly tailored to promote a compelling state interest. Reasonable, nondiscriminatory restrictions, however, need be justified only by legitimate regulatory interests.

*Barr v. Galvin*, 626 F.3d 99, 109 (1st Cir. 2010).

Courts assess the applicable level of scrutiny under *Anderson-Burdick* based upon both the reach of the burden and the severity of the burden on those it impacts. *See Werme v. Merrill*, 84 F.3d 479, 483-484 (1st Cir. 1996); *Barr v. Galvin*, 626 F.3d 99, 109 (1st Cir. 2010); *Ayers-Schaffner v. DiStefano*, 860 F. Supp. 918, 920 (D.R.I. 1994); *Crawford v. Marion Cty. Election Bd.,* 553 U.S. 181, 198–99 (2008); *see also One Wisconsin Inst., Inc. v. Thomsen,* 198 F. Supp. 3d 896, 930 (W.D. Wis. 2016), *order enforced,* 351 F. Supp. 3d 1160 (W.D. Wis. 2019) ("the court must focus on the burdens that the challenged provisions place on eligible voters who cannot comply . . . ."). The fact that a majority of voters "are able to comply . . . does not mean that the burdens that these laws impose are constitutionally insignificant." *One Wisconsin*, 198 F. Supp. 3d at 930. Because the "right to vote is personal," an *Anderson-Burdick* claim "is not defeated by the fact that 99% of other people can" easily exercise the franchise despite the challenged provision. *Frank v. Walker,* 819 F.3d 384, 386 (7th Cir. 2016).

The *Anderson-Burdick* balancing test requires the court to measure "the character and magnitude of the asserted injury" against "the precise interests put forward by the State as justifications for the burden." *Anderson,* 460 U.S. at 789; *see Democratic Nat'l Comm. v. Bostelmann,* 2020 U.S. Dist. LEXIS 57918 at *36-37 (D. Wisc. Apr. 2, 2020) (applying the Anderson-Burdick test to evaluate a similar witness signature requirement).

The Supreme Court has made clear that it has not identified any "litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters." *Crawford,* 553 U.S. at 191. Yet "however slight that burden may appear," the reviewing court must find that it is "justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* (*quoting Norman v. Reed,* 502 U.S. 279, 288–89 (1992)); *McLaughlin v. N.C. Bd. of Elections,* 65 F.3d 1215, 1221 n.6 (4th Cir.

24

1995) ("We believe that a regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational.").

Once the burdens on voters are weighed, a court must weigh those burdens against the "precise interest put forward by the State as justifications for the burden imposed by its rule." *Burdick,* 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789). Even if a state law imposes a slight burden, a court must still "actually weigh the burdens imposed on the plaintiff against the *precise* interests put forward by the State," and take into account "the extent to which those interests make it necessary to burden the plaintiff's rights," unlike traditional rational basis review. *Price v. N.Y. State Bd. of Elections,* 540 F.3d 101, 108-09 (2d Cir. 2008) (internal citations and quotation marks omitted) (emphasis added).

Under the *Anderson-Burdick* framework, Rhode Island's enforcement of the witness or notary requirement—in the midst of the global pandemic—fails both because the burdens are severe and because the state's interests are minimal.

**2.   THE WITNESS OR NOTARY REQUIREMENT MERITS AT LEAST HEIGHTENED SCRUTINY BECAUSE IT WILL DISENFRANCHISE THOUSANDS OF VOTERS WHILE WORSENING A PUBLIC HEALTH CRISIS**

Here, in the midst of the COVID-19 pandemic, the requirement that all citizens of Rhode Island must either: (1) appear in-person at the polls, (2) find two other adults to witness and sign their mail ballot envelope, or (3) find a notary to sign their mail ballot envelope; severely or at least significantly burdens the right to vote. The burden is both wide-reaching—affecting many thousands of Rhode Island citizens—and severe. In essence, the witness or notary requirement will force many thousands of Rhode Islanders to choose between exercising their right to vote in

25

the upcoming State primary and general elections and adhering to the State's own social distancing guidelines. If they choose the former, they expose themselves, their families, and their communities to a heightened risk of COVID-19. If they choose the latter, they are disenfranchised.

### a. THE WITNESS OR NOTARY REQUIREMENT WILL BURDEN MANY THOUSANDS OF RHODE ISLAND VOTERS WHO WISH TO PROTECT THEIR OWN HEALTH AND THE HEALTH OF THOSE AROUND THEM

The enforcement of Rhode Island's witness or notary requirement has the potential to disenfranchise many thousands of the State's voters given the COVID-19 pandemic, far more than would normally be impacted by the requirement. In Rhode Island's 2020 presidential primary, 83% of voters chose to vote by mail.[88] Unburdened by the State's witness or notary requirement and facing a very real risk to their health, an "overwhelming number of Rhode Islanders chose to safely vote from home."[89] In stark contrast, in Rhode Island's 2016 presidential primary, 3.6% of voters completed mail-in ballots while 96.4% went to polling places.[90] While the State's witness or notary requirement burdens mail-in voters in normal times, today this requirement has the potential to disenfranchise a wide swath of the Rhode Island electorate.

Voters who live alone make up a large portion of Rhode Island's eligible voters, and will ordinarily not be able to comply with the State's witness or notary requirement without violating

---

[88] *2020 Presidential Primary Election Task Force Presentation*, R.I. DEP'T OF ST., 4 (July 9, 2020), https://vote.sos.ri.gov/Content/Pdfs/PPP%20Task%20Force%20July%209%202020%20Final.pdf.
[89] *Id.*
[90] *2016 Presidential Primary Statewide Summary*, ST. OF R.I. BD. OF ELECTIONS (updated May 4, 2016), https://www.ri.gov/election/results/2016/presidential_preference_primary/# ("Show mail ballot breakout"). In the 2016 Rhode Island presidential primary, 6,411 voters voted by mail versus 177,661 in person voters. Mail ballots represented 3.6% of the total ballots cast.

social distancing guidelines. According to Federal Census estimates, in 2018 an estimated 197,000 Rhode Islanders over the age of 18, 23.45% of the estimated 840,000 Rhode Islanders of voting age in 2018, live alone.[91] Based upon their share of the voting-age population, roughly 185,556 of Rhode Island's 791,284 registered voters live alone.[92] Of the estimated 197,000 voting-age Rhode Islanders living alone, an estimated 59,000 are aged 65 and older and an estimated 42,000 are disabled.[93]

This already-substantial number does not account for persons who live with only one other person. In addition to the estimated 197,000 Rhode Island voters living alone, a further 289,000 live in a household of two.[94] Like those living alone, these Rhode Islanders will ordinarily not be able to comply with the witness or notary requirement without disregarding State and Federal health guidelines. Even those living in households with three or more persons do not necessarily live with two other adults who may serve as witnesses. In a four-person household consisting of two parents and two children, the parents will not be able to comply with the witness or notary requirement without violating social distancing guidelines. In addition, not all adults will be capable of serving as witnesses. For instance, plaintiff Oakley lives with both her mother and her grandmother, but her grandmother is not capable of serving as a witness. Oakley Decl. ¶ 2. Ms. Oakley's situation also highlights the heightened risk faced by those who regularly interact with people uniquely vulnerable to COVID-19, either because of their age or chronic medical conditions. If Ms. Oakley is forced to vote in-person she risks the health of her grandmother, and the health of the elderly individuals whom her mother works with. *Id.* ¶¶ 7, 11.

---

[91] *See* Ex. H, U.S. Census 2018: ACS 5-year estimate data profile.
[92] *See id.*; *Registration Status of Voters in Rhode Island as of July 2020*, R.I. DEP'T OF ST. (accessed July 18, 2020), https://datahub.sos.ri.gov/RegisteredVoter.aspx.
[93] *See* Ex. H, U.S. Census 2018: ACS 5-year estimate data profile.
[94] *Id.*

The burden imposed by the State's witness or notary requirement is far from limited to the estimated 185,556 registered Rhode Island voters who live alone.

Courts have found that laws burdening far fewer (and a lower percentage of) voters violate *Anderson-Burdick*. "[E]ven one disenfranchised voter . . . is too many." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (finding minority voters were entitled to a preliminary injunction on a bill eliminating same-day registration); *see also Ne. Ohio Coal. For Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) (affirming order enjoining state from rejecting ballots cast in the wrong precinct due to poll worker error, where rejected ballots constituted less than .248% of votes cast); *Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D.N.H. 2018) (enjoining state from enforcing law rejecting ballots due to signature mismatch, despite state's rejection of only .35% of all absentee ballots submitted).

The State's witness or notary requirement will burden a large majority of the Rhode Island electorate that will choose to vote by mail, with tens of thousands facing a particularly acute burden based on their inability to obtain the required witnesses for casting a mail-in ballot without disregarding critical State and Federal health guidelines.

### b.  THE BURDEN PLACED ON VOTERS IS SEVERE AND IRREPARABLE

The State's witness or notary requirement means that tens of thousands of Rhode Islanders will not be able to cast a ballot without disregarding State and Federal health guidelines that could put their health in jeopardy. The requirement will result in irreparable disenfranchisement for those who cannot risk their health or life to satisfy it. Dr. Fine, who is personally familiar with the State's witness or notary requirement, explains that "[t]he witness or notary requirement means that many individuals must invite one or two persons into their home,

or travel outside their home to meet these witnesses. Either of these situations would violate social distancing guidelines and increase the likelihood that those involved will contract COVID-19 and transmit it to others." Fine Decl. ¶ 10. For this reason, "[t]he current witness requirement carries with it a high risk to the general public's health." *Id.* ¶ 9. His statement is confirmed by State and Federal health guidance, echoed by Defendants and other State officials. *See* Factual Background Sec. C.

Rhode Island voters' other option—in-person voting—is equally, if not more, dangerous for vulnerable residents. As Plaintiff Baker notes, "[v]oting in person would involve waiting in line with other voters, interacting with poll workers, and touching voting equipment." Baker Decl. ¶ 10. Recognizing that in-person voting necessarily requires violating social distancing guidelines, in its presidential primary "guide for eligible voters" the Secretary of State's office told voters that voting by mail is "the best way for RI voters to follow social distancing best practices."[95] The danger of in-person voting is further confirmed by the experience of voters in Wisconsin, where researchers linked dozens of cases of COVID-19 to that state's failure to provide mail ballots with sufficient time for many voters to return them.[96] There can be no doubt that social distancing and minimizing person-to-person contact is critical to avoid contracting and spreading the virus, and that the witness or notary requirement will require tens of thousands of Rhode Island voters to violate these protocols whether they choose to vote by mail or in person. As the Eleventh Circuit stated in *Dem. Exec. Comm. of Fla. v. Lee,* "even one

---

[95] *All About the Rhode Island Presidential Primary: A Guide for Eligible Voters*, RI DEP'T OF ST., (JUNE 2, 2020) https://vote.sos.ri.gov/Content/Pdfs/June2PPPGuide.pdf.

[96] Chad D. Cotti et al., *The Relationship Between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on COVID-19: Evidence From the Wisconsin Primary*, Working Paper 27187, NAT'L BUREAU OF ECON. RESEARCH (May 2020), available at https://www.nber.org/papers/w27187. In this study, researchers determined that 71 positive COVID-19 cases were directly traceable to in-person voting.

disenfranchised voter . . . is too many." 915 F.3d 1312, 1315 (11th Cir. 2019) (quoting *LWVNC*, 769 F.3d at 244).

Confronted with a highly similar set of facts, the court in *League of Women Voters of Va.* found that Virginia's witness signature requirement for absentee ballots—which required *one* witness—posed an unconstitutional burden on the right to vote as applied during the Covid-19 pandemic. 2020 U.S. Dist. LEXIS 79439. The Court stated:

> In ordinary times, Virginia's witness signature requirement may not be a significant burden on the right to vote. But these are not ordinary times. In our current era of social distancing—where not just Virginians, but all Americans, have been instructed to maintain a minimum of six feet from those outside their household—the burden is substantial for a substantial and discrete class of Virginia's electorate.

*Id.* at *24-25. The Court considered that the witness requirement forced Virginians to choose between following health and safety guidance and their right to vote. The Court declared "[t]he Constitution does not permit a state to force such a choice on its electorate" and that the witness requirement poses a "substantial burden" on the right to vote. *Id.* at *25, 28.

In *Thomas v. Andino* the court likewise found that the plaintiffs were likely to prevail on their claim that the state's requirement that a *single* witness be present when a voter signs their mail-in ballot posed an undue burden on South Carolina voters. 2020 U.S. Dist. LEXIS 90812, *55 (D.S.C. May 25, 2020). The court observed that, while the state's witness requirement had not "absolutely prohibited voting," in-person voting presented voters with an "illusory choice between exercising their right to vote and placing themselves at risk of contracting a potentially terminal disease." *Id.* at *46 n.20. While declining to determine the exact level of scrutiny to apply to the challenged law, the court found that the plaintiffs "have identified burdens inflicted

by the Witness Requirement, which are at least of sufficient magnitude to warrant the injunction." *Id.* at *50.

While the State's witness or notary requirement burdens all Rhode Island voters, older voters face unique risks due to their particular susceptibility to the COVID-19 virus. Plaintiffs' expert Dr. Reingold notes that while people of all ages have contracted and died from COVID-19, it is particularly fatal for older individuals. Reingold Decl. ¶ 7. The CDC cautions that "[a]mong adults, the risk for severe illness from COVID-19 increases with age, with older adults at highest risk."[97] Preliminary data shows a 5.6% mortality rate for individuals older than 65.[98]

Recognizing the danger to their health, older voters overwhelmingly voted by mail in the State's June 2, 2020 presidential primary election, with the share of voters voting by mail increasing with the voter's age.[99] A presentation at an Election Task Force meeting reviewing Rhode Island's June 2, 2020 presidential primary noted that 99% of the Greatest Generation (those approximately age 90 and older) voted by mail in the 2020 presidential primary vs. 33% in the 2016 presidential primary.[100] A further 94% of the Silent Generation (those approximately age 75 to 92) voted by mail in the 2020 presidential primary vs. 6% in the 2016 presidential primary.[101] If the Court does not enjoin the State from enforcing the witness or notary requirement, a large share of the 59,000 Rhode Islanders aged 65 and older who live alone—and the many more that live with only one other person or simply do not have two competent

---

[97] *See Older Adults*, CENTER FOR DISEASE CONTROL AND PREVENTION (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[98] Fransisco Perez-Saez et al., *Serology-informed Estimates of SARS-COV-2 Infection Fatality Risk in Geneva, Switzerland*, OSF PREPRINTS , https://osf.io/wdbpe/ (last updated June 15, 2020) (data is based on a study of COVID-19 mortality in Geneva, Switzerland).

[99] *2020 Presidential Primary Election Task Force Presentation*, R.I. DEP'T OF ST., 5 (July 9, 2020), https://vote.sos.ri.gov/Content/Pdfs/PPP%20Task%20Force%20July%209%202020%20Final.pdf (stating that voting by mail "protected our most vulnerable populations[.]").

[100] *Id.*

[101] *Id.*

witnesses in their household—will undoubtedly choose not to vote rather than risking their health.[102]

For the estimated 42,000 individuals of voting age who have disabilities and who live alone in Rhode Island—and the many more who live with only one other person or do not live with two competent adults—the risk is further magnified.[103] According to the CDC, some people with disabilities might be at a higher risk of infection or severe illness because of underlying chronic medical conditions such as chronic lung disease, a serious heart condition, or a weakened immune system.[104] Further, individuals with disabilities may need help reaching the polls and/or casting their ballot, exposing an additional person to COVID-19. For instance, Plaintiff Oakley is blind and will require her mother to drive her to the polls. Oakley Decl. ¶ 10. This requires exposing additional persons to COVID-19.

The burden placed on voters by the State's witness or notary requirement is in no way lessened by Defendant Gorbea's authorization of online notarization for the pendency of the state of emergency.[105] To take advantage of online notarization, the voter must (1) have a high-speed internet connection and connect to the notary via approved video conference software, (2) provide either two forms of ID or the oath of a credible witness, (3) mail the document to the Notary for stamping and receive the document back by mail—in time to then mail the ballot to the Board of Elections by Election Day—and (4) pay any required fee.[106] Because mail ballot

---

[102] *See* Ex. H, U.S. Census 2018: ACS 5-year estimate data profile.
[103] *Id.*
[104] *See People with Disabilities*, CENTER FOR DISEASE CONTROL AND PREVENTION (April 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html.
[105] Mark Reynolds, *R.I. Approves Electronic Notarization During Coronavirus Outbreak*, PROVIDENCE JOURNAL (April 6, 2020), https://www.providencejournal.com/news/20200406/ri-approves-electronic-notarization-during-coronavirus-outbreak.
[106] *See Rhode Island Remote Online Notarization Temporary Performance Guide 2–3*, R.I. DEP'T OF ST., available at https://www.sos.ri.gov/assets/downloads/documents/RI-RON-guidance-document.pdf.

certification envelopes are not digitized, the voter will also need access to a suitable scanner.[107] At each stage, this process is burdensome and exclusionary of those without adequate technology, without adequate documentation, or without adequate time and resources to send and receive the document by mail. For instance, Plaintiff Monahan does not have access to a suitable computer or internet connection and cannot take advantage of this service. Monahan Decl. ¶ 11. Not to mention the fee. Voters should not have to pay to vote.

Finally, it is unclear how a voter can locate a qualified notary. To perform online notarizations a notary must download and be trained in the services of an approved audio-video solution provider and register with the State to perform online notarizations,[108] whereas the State's notary lookup service does not identify whether a notary is authorized and registered for online notarizations unless one searches for the name of a particular notary and the notary has asked to be so listed.[109] The time, expense, and logistical hassle of this process make it illusory for countless voters, particularly older voters.[110]

The broad sweep and severe health repercussions of the burden of the witness or notary requirement merit heightened, if not strict, scrutiny, and reveal the unconstitutional burden Rhode Island voters will face if it remains in place.

---

[107] *See Process for Remote Online Notarization (RON) of Paper Documents*, R.I. DEP'T OF ST., available at https://www.sos.ri.gov/assets/downloads/documents/RON_Tangible_Document_Bulletin.pdf.
[108] *See Rhode Island Remote Online Notarization Temporary Performance Guide 3*, R.I. DEP'T OF ST., available at https://www.sos.ri.gov/assets/downloads/documents/RI-RON-guidance-document.pdf.
[109] *See Notary Public and Justice of the Peace (JP) Status Lookup*, R.I. SEC'Y OF ST., http://business.sos.ri.gov/notarypublicsearch/ (last visited July 20, 2020).
[110] In one survey, 73% of those aged 65 and older said when they get a new electronic device, they usually need someone's assistance in setting up or learning how to use the technology. Monica Anderson and Andrew Perrin, *Tech Adoption Climbing Among Older Adults*, PEW RESEARCH CENTER (May 17, 2017), https://www.pewresearch.org/internet/2017/05/17/barriers-to-adoption-and-attitudes-towards-technology/. Seniors with a disability reported being less likely to use digital technology, including the internet in general.

**B.  PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR AMERICANS WITH DISABILITIES ACT CLAIM BECAUSE THE WITNESS OR NOTARY REQUIREMENT EXCLUDES AND FAILS TO ACCOMMODATE INDIVIDUALS WITH DISABILITIES**

Title II of the Americans with Disabilities Act prohibits discrimination against individuals with disabilities by state and local government entities. 42 U.S.C. § 12132. Proving a violation of Title II requires showing that: (1) plaintiffs are qualified individuals with disabilities; (2) plaintiffs are being excluded from participating in, or denied the benefits of, a public entity's services, programs, or activities or are otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of disability. *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006). Plaintiffs Oakley, Monahan and many members of LWVRI have a disability within the meaning of the ADA.[111] Koster Decl. ¶ 8, Oakley Decl. ¶ 3, Monahan ¶ 4, 5. They are "qualified" for the programs, services, and activities being challenged herein in that they meet all essential eligibility requirements to vote in Rhode Island. 42 U.S.C. § 12131(2).

Under Title II of the ADA, state and local governments are forbidden from imposing or applying eligibility criteria for public services, programs, or activities, including voting, that screen out or tend to screen out individuals with disabilities from fully and equally enjoying those programs.[112] Public entities must also make reasonable modifications of policies, practices, or procedures, including voting and election procedures, when such modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that

---

[111] An individual with disability is defined by the ADA as a person who (1) has a physical or mental impairment that substantially limits one or more major life activities, (2) has a history or record of such an impairment, or (3) is perceived by others as having such an impairment. 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108(a)(1). Individual plaintiffs Oakley, Monahan and Baker, as well as many members of organizational plaintiffs, satisfy the first prong of this definition.
[112] 28 C.F.R. § 35.130(b)(8).

making the modifications would fundamentally alter the nature of the service, program, or activity.[113]

The State's witness or notary requirement constitutes an eligibility criteria criterion that screens out individuals with disabilities from voting, and Defendants have failed to make reasonable modifications to that requirement. The witness or notary requirement will require that many individuals with disabilities, for whom COVID-19 poses grave health risks,[114] engage in an in-person interaction outside the home in order to vote. This requirement will screen out many individuals with disabilities who are unwilling or unable to risk their life and health in this way.

Modifying the witness or notary requirement is reasonable and necessary in order to ensure equal access to voting for individuals with disabilities whose health statuses severely limit their ability to leave home or have any personal contacts with others amid the COVID-19 pandemic. In *Nat'l Fed'n of the Blind v. Lamone*, the Fourth Circuit found that Maryland violated Title II by failing to modify its absentee voting program, which required voters to mark the hardcopy ballot by hand. 813 F.3d 494 (4th Cir. 2016). Because disabled votersvoters with disabilities would need the assistance of others to vote absentee, the Court found that disabled voters they did not have equal and meaningful access to the absentee voting program. *Id.* In *Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D.N.H. 2018), the Court enjoined state officials from enforcing New Hampshire's signature match requirement for absentee ballots, in part because the execution of identical signatures on multiple absentee forms may be more difficult for some voters due to "unintentional factors includ[ing] age, physical and mental condition, disability,

---

[113] 28 C.F.R. § 35.130(b)(7).
[114] *See People with Disabilities*, CENTER FOR DISEASE CONTROL AND PREVENTION (April 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html.[115] Wendy R. Weiser & Harold Ekeh, *The False Narrative of Voter Fraud*, BRENNAN CTR. FOR JUSTICE (Apr. 10, 2020) https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud.

medication, stress, accidents, and inherent differences in a person's neuromuscular coordination and stance." *Id.* at 205.

### C.  THE HARM INFLICTED UPON VOTERS FAR OUTWEIGHS THE STATE'S INTEREST IN ELECTION INTEGRITY

Rhode Island does not have a weighty—let alone sufficiently compelling—interest in enforcing the witness or notary requirement under these circumstances. Indeed, two other federal courts have determined that a state's interest in enforcing substantially similar (but less burdensome) requirements, in the midst of the COVID-19 pandemic, does not outweigh their burden on citizens' fundamental right to vote.

The State's witness or notary requirement does not prevent fraud, and therefore does not serve a significant state interest. Studies confirm that fraud is extremely rare nationwide,[115] and The Heritage Foundation's comprehensive database of allegedly proven instances of voter fraud lists no examples of voter fraud in Rhode Island.[116] Without a problem, the State cannot disenfranchise voters as a solution. *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 220 (D.N.H. 2018) (finding state's disenfranchisement of approximately 740 voters to prevent two instances of absentee-voter fraud, one each in 2012 and 2016, was not justified). Even assuming states other than Rhode Island have a significant problem of mail-in voter fraud (they do not), this cannot justify the disenfranchisement of Rhode Island citizens. *See Rideout v. Gardner*, 838 F.3d 65, 73 (1st Cir. 2016) ("A few recent instances of vote buying in other states do not substantiate New

---

[115] Wendy R. Weiser & Harold Ekeh, *The False Narrative of Voter Fraud*, BRENNAN CTR. FOR JUSTICE (Apr. 10, 2020) https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud.
[116] *A Sampling of Recent Election Fraud Cases from Across the United States*, HERITAGE FOUND. (accessed July 17, 2020), https://www.heritage.org/voterfraud.

Hampshire's asserted interest in targeting vote buying through banning the publication of ballot selfies.").

While the State has an interest in election integrity, this interest is sufficiently protected by laws other than the witness requirement. In fact, Rhode Island's witness requirement is likely the *least* effective of several requirements and procedures designed to promote election integrity in the mail voting process. First, mail-in ballots are assessed to ensure that the name, residence, and signature on the ballot itself all match that same information on the ballot application, including ensuring "that both signatures are identical." R.I. Gen. Laws 17-20-26(c)(2). The Board of Elections "regularly rejects mail ballots where there is a substantial difference between the two signatures or if the witness does not provide enough information so that they can be identified and questioned."[117] Second, the State may also request that voters provide supplementary identifying information, as evidenced by the Governor's April 17, 2020 order providing that the Board of Elections may "request mail ballot applicants to voluntarily provide the last four digits of the voter's Social Security number or a valid driver's license number."[118] Third, in the rare case someone were to commit voter fraud, it is a felony in Rhode Island, punishable by up to ten years of imprisonment with a fine between $1,000 and $5,000. R.I. Gen. Laws §§ 17-23-3 & 17-20-1. These election integrity measures have proven effective. Rhode Island has not experienced a problem with mail voter fraud, even in the most recent election that occurred without the witness or notary requirement.

---

[117] Eric Lynch, *Are Rhode Island's Mail in Ballots a "Gigantic, Illegal Loophole,"* Wm. & Mary L. Sch.: Election L. Soc'y (Apr. 11, 2018), http://electls.blogs.wm.edu/2018/04/11/rhode-islands-mail-ballots-gigantic-illegal-loophole/.
[118] R.I. Exec. Order No. 20-27 at 2 (Apr. 17, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-27.pdf.

In addition, the State's decision to suspend the witness or notary requirement for the presidential primaries held June 2, 2020, and the unqualified success of this election, is dispositive evidence that the State does not have a significant interest in the enforcement of this requirement. Leading up to the June 2020 presidential primary, the State not only eliminated the witness or notary requirement,[119] but was in fact "encouraging everybody to just vote by mail[.]"[120] Defendant Gorbea herself advised that "[v]oting from home is the safe and secure way to make your voice heard during the COVID-19 pandemic."[121] In its presidential primary "guide for eligible voters," the Secretary of State's office told voters that voting by mail is "the best ways for RI voters to follow social distancing best practices."[122] Further, and as detailed previously, this election was successful, which the State's Election Task Force attributed to social distancing made possible by the suspension of the witness or notary requirement.[123] *See* Factual Background Sec. D.

The State may also argue it has an interest in adhering to existing election rules in an effort to not confuse voters before an approaching election. However, it is again worth noting that leading up to the June 2, 2020 presidential primaries, the State not only eliminated the witness or notary requirement,[124] but was in fact encouraging citizens to vote by mail. If the change was not confusing to voters then, it will not be now. And since the June 2, 2020

---

[119] R.I. Exec. Order No. 20-27 at 2 (Apr. 17, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-27.pdf.

[120] Erica Ponte, *RI Secretary of State Encourages Mail Ballot Voting in Presidential Primary*, WPRI (May 14, 2020), https://www.wpri.com/news/elections/ri-secretary-of-state-encourages-mail-ballot-voting-in-presidential-primary/.

[121] Press Release, *Secretary Gorbea to Rhode Islanders: Vote from Home this Week*, St. of R.I. (May 26, 2020), https://www.ri.gov/press/view/38424.

[122] *All About the Rhode Island Presidential Primary: A Guide for Eligible Voters*, R.I. Sec.'y of St. (June 2, 2020), https://vote.sos.ri.gov/Content/Pdfs/June2PPPGuide.pdf.

[123] *Id.* at 4.

[124] R.I. Exec. Order No. 20-27 at 2 (Apr. 17, 2020), https://governor.ri.gov/documents/orders/Executive-Order-20-27.pdf.

presidential primaries were conducted without the witness requirement, it is the reinstatement of that requirement while the pandemic is ongoing that is likely to confuse voters. After all, the majority of Rhode Island voters likely cast a mail-in ballot for the first time in the most recent election and therefore are entirely unfamiliar with the witness requirement.

Because the witness requirement offers little if any benefit to election integrity, even a lesser burden would still outweigh any governmental benefit and make the provision unconstitutional during community transmission of COVID-19.

### D.  A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM TO PLAINTIFFS' CONSTITUTIONAL RIGHTS

If this Court does not act to enjoin the State from enforcing the witness or notary requirement, Rhode Island voters soon face a Sophie's choice: risk your health or forego your constitutional rights. This is precisely the choice confronting Individual Plaintiffs and a number of members of both the LWVRI and CC-RI, not to mention thousands of other Rhode Island citizens. The State's mail-in ballots and accompanying certification envelopes will need to be printed imminently. Voters' applications for these mail-in ballots must be received by the voter's local board by August 18, 2020 to be valid for the State's September 8, 2020 primary.[125] Only an immediate temporary restraining order and injunction from this Court will prevent irreparable harm to Plaintiffs' rights.

The violation of a constitutional right is presumed to demonstrate "irreparable harm." *Elrod v. Burns,* 427 U.S. 347, 373 (June 28, 1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also*

---

[125] *See Upcoming Elections*, ST. OF R.I. BD. OF ELECTIONS, (last visited July 22, 2020), https://elections.ri.gov/elections/upcoming/.

*Asociación de Educación Privada de Puerto Rico*, 490 F.3d 1,  21 (1st Cir. 2007) (applying *Elrod* to irreparable harm component of permanent injunction analysis). Indeed, courts routinely deem restrictions on fundamental voting rights irreparable injury. *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) ("The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm."); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986). This is because "once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin this law." *League of Women Voters of N.C.*, 769 F.3d at 247; *see also Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016) (noting that voting rights cases are not situations "where failing to grant the requested relief would be a mere inconvenience to Plaintiff and its members"—an election "isn't golf: there are no mulligans."). And of course there "can be no injury more irreparable" than "serious, lasting illness or death." *Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020).

The harm voters will suffer if they are forced to violate social distancing guidelines, whether by voting in-person or securing two witnesses or a notary, is anything but speculative. It is confirmed by the rising number of COVID-19 cases in Rhode Island and by State and Federal health guidelines. *See* Factual Background Sec. B. It is further confirmed by the experience of voters in Wisconsin, where researchers linked dozens of cases of COVID-19 to that state's failure to provide mail ballots with sufficient time for many voters to return them.[126] Here

---

[126] Chad D. Cotti et al., *The Relationship Between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on COVID-19: Evidence From the Wisconsin Primar*y, Working Paper 27187, NAT'L BUREAU OF ECON. RESEARCH (May 2020), available at https://www.nber.org/papers/w27187.

Individual Plaintiffs, as well as thousands of other Rhode Island voters, face disenfranchisement if they do not vote, or risk serious illness or even death if they do. In either case, the harm to Plaintiffs will be irreparable.

The harm to Individual Plaintiffs and other Rhode Island voters is not only irreparable, but imminent. If the Court does not immediately enjoin the State from enforcing the witness or notary requirement, it is beyond doubt that Individual Plaintiffs and thousands more Rhode Island voters will be denied the opportunity to cast a vote in the September primary election, and likely the general election as well. "The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm." *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020); *see also Thomas*, 2020 U.S. Dist. LEXIS 90812, at *57 ("to the extent that [] Plaintiffs have a likely constitutional violation, [] Plaintiffs have satisfied their initial showing of irreparable harm.") (enjoining enforcement of absentee ballot witness requirement).

Organizational plaintiffs LWVRI and CC-RI face similar and additional harms. Multiple members of both LWVRI and CC-RI live alone, and some face additional risks and obstacles on account of their age and/or disability. Koster Decl. ¶¶ 8, 9; Marion Decl. ¶¶ 8, 9. A voting rights organization is "irreparably harmed when the right to vote is wrongfully denied or abridged— whether belonging to its membership or the electorate at large." *N.C. State Conf. of NAACP v. Cooper*, No. 1:18CV1034, 2019 WL 7372980, at *24 (M.D.N.C. Dec. 31, 2019); *see also Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018) (finding plaintiff organization's harm "to its organizational interests is coterminous with the harms suffered by its citizen members").

Additionally, the witness requirement harms the LWVRI's and CC-RI's mission of ensuring that all qualified Rhode Islanders are registered to vote and participate in the democratic process, because "[their] mission has been 'frustrated' by the challenged conduct and [they have] expended resources to combat it." *Equal Means Equal v. Dept' of Educ.*, 2020 U.S. Dist. LEXIS 46810 at *12 (D. Mass. 2020) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Action NC v. Stranch*, 216 F. Supp. 3d 597, 642 (M.D.N.C. 2016); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding irreparable harm based on legal barriers that "ma[de] it more difficult for [the organization] to accomplish their primary mission of registering voters"). Many of the LWVRI's and CC-RI's members are particularly vulnerable to COVID-19 either due to their age or other underlying health conditions. Marion Decl. ¶¶ 8, 9; Koster Decl. ¶¶ 8, 9. Others live in households with individuals particularly vulnerable to COVID-19. Marion Decl. ¶ 9.

The LWVRI and CC-RI have diverted, and will continue to divert, resources and devoted significant time and energy to developing and advocating for recommendations for how the Rhode Island government could adjust its mail-in voting system to ensure voters are able to safely cast their ballots in the September and November 2020 elections and are not disenfranchised by the witness or notary requirement. Marion Decl. ¶¶ 5-7, 11, Koster Decl. ¶¶ 5-7, 10. If absentee voters were not required to have their mail-in ballot envelopes signed by either two lay witnesses or one notary, CC-RI could spend less of its volunteer resources and time on educating voters about the witness requirement, and more on its other critical activities including voter registration, voter education, voter protection, and voter mobilization work. Marion Decl. ¶ 11. These lost opportunities constitute an irreparable harm. *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("[W]hen a plaintiff

loses an opportunity to register a voter, the opportunity is gone forever."); *see also LWVNC*, 769 F.3d at 247; *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 662–63 (S.D. Ind. 2018); *Action NC*, 216 F. Supp. 3d at 642–43.

In short, the State's imminent preparations to enforce its witness or notary requirement will lead directly to Plaintiffs' irreparable harm to their health or their fundamental right to vote.

### E.  THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST SUPPORT INJUNCTIVE RELIEF

Here, the public interest overwhelmingly favors granting interim relief. The "public interest . . . favors permitting as many qualified voters to vote as possible." *LWVNC*, 769 F.3d at 247–48 (citations and internal quotation marks omitted). "The Right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Griffin v. Burns*, 431 F. Supp. 1361, 1365 (D.R.I. 1977). And as this Court has stated, enforcing election regulations that pit an individual's right to participate in the democratic process against public health guidelines in the midst of a pandemic is against the public interest. *Acosta*, 2020 U.S. Dist. LEXIS 115782, at *16 ("In-person signatures amid a pandemic, one comprised of a highly contagious virus transmitted through close human contact, actually would undermine the public interest.").

In contrast, a "state is in no way harmed by the issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation and internal quotation marks omitted). After all, "upholding constitutional rights surely serves the public interest," of which the State is the

custodian. *Id.* It is no hardship for the State not to enforce a requirement which the State itself suspended recently (and which was an unqualified success). *See* Factual Background Section D.

Enjoining the witness or notary requirement will serve the public interest on several fronts. It will allow Rhode Islanders to continue to observe health guidelines. *See* Factual Background Sec. C. It will also allow Rhode Islanders to safely exercise their fundamental right to vote. Meanwhile, Rhode Island already has a raft of other electoral integrity provisions to regulate voting by mail, *see* Factual Background Sec. G, and the witness or notary requirement provides an ineffectual method of doing so in any event. It will not be missed.

By granting the Plaintiffs' requested injunction, the Court will vindicate the public interests of promoting both public health and access to the franchise at a critical moment for Rhode Island citizens.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant a temporary restraining order and preliminary injunction enjoining Defendants from enforcing the witness or notary requirement for the State's pending September primary and November general elections.

Dated:      July 23, 2020                     Respectfully submitted,


                                              /s/ *Lynette Labinger*
                                              Lynette Labinger, Esq. (Bar No.1645)
                                              128 Dorrance St., Box 710
                                              Providence, RI  02903
                                              (401) 465-9565 (phone)
                                              ll@labingerlaw.com
                                              Cooperating counsel,
                                              **AMERICAN CIVIL LIBERTIES UNION**
                                              **FOUNDATION OF RHODE ISLAND**

/s/ *Julie A. Ebenstein*
Julie A. Ebenstein, Esq. (*pro hac vice pending*)
Dale E. Ho, Esq. (*pro hac vice pending*)
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION, INC.**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 284-7332 (phone)
jebenstien@aclu.org
dho@aclu.org


/s/ *Danielle Lang*
Danielle Lang, Esq. (*pro hac vice pending*)
Jonathan Diaz, Esq. (*pro hac vice pending*)
Simone Leeper*, Esq. (*pro hac vice pending*)
**CAMPAIGN LEGAL CENTER**
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200 (phone)
dlang@campaignlegal.org
jdiaz@campaignlegal.org
sleeper@campaignlegal.org


*Admitted to practice only in Florida; supervised by a member of the District of Columbia Bar.


/s/ *Michael C. Keats*
Michael C. Keats, Esq. (*pro hac vice pending*)
Christopher H. Bell, Esq.* (*pro hac vice pending*)
**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**
One New York Plaza
New York, NY 10004
(212) 859-8914 (phone)
(212) 859-4000 (fax)
Michael.Keats@friedfrank.com
Christopher.Bell@friedfrank.com

45

*Admitted only in Pennsylvania; not
admitted in the District of Columbia;
supervised by a member of the District of
Columbia Bar.