# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| COMMON CAUSE RHODE ISLAND, LEAGUE OF WOMEN VOTERS OF RHODE ISLAND, MIRANDA OAKLEY, BARBARA MONAHAN, and MARY BAKER,<br><br>  Plaintiffs,<br><br>  v.<br><br>NELLIE M GORBEA, in her official capacity as Secretary of State of Rhode Island; DIANE C. MEDEROS, LOUIS A. DESIMONE JR., JENNIFER L. JOHNSON, RICHARD H. PIERCE, ISADORE S. RAMOS, DAVID H. SHOLES, and WILLIAM WEST, in their official capacities as members of the Rhode Island Board of Elections,<br><br>  Defendants. | C.A. No. 1:20-CV-00318-MSM-LDA |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

The plaintiffs, Common Cause Rhode Island, League of Women Voters of Rhode Island, Miranda Oakley, Barbara Monahan, and Mary Baker, filed this action seeking to enjoin the State's enforcement of the witness or notary requirement for the two upcoming statewide elections in 2020: the primary election on September 8 and the general election on November 3. The plaintiffs have named as defendants the Rhode Island Secretary of State and the members of the Rhode Island Board of Elections.

The parties have submitted to the Court a proposed Consent Judgment and Decree ("Consent Decree") which would resolve the plaintiffs' claims. On July 28, 2020, the Court conducted a Fairness Hearing to review the proposed Consent Decree. For the following reasons, the Court approves the Consent Decree and thereby GRANTS the parties' Joint Motion to Approve Consent Judgment (ECF No. 18.)

## I.    BACKGROUND

With exceptions related to voters in medical facilities, abroad, or out of state for military service, Rhode Island law requires that any voters seeking to vote by mail must have their ballot envelope signed by either two witnesses or a notary public. R.I.G.L. §§ 17-20-2.1(d)(1), (d)(4) ("[T]he signature on the certifying envelopes containing a voted ballot must be made before a notary public or two (2) witnesses who shall set forth their addresses on the form."). The two witnesses or the notary for each ballot must actually witness the voter marking the ballot. R.I.G.L. §§ 17-20-21 and 17-20-23. Rhode Island is one of three states with such a requirement.[1]

All the parties share a concern with the integrity of the election process. The Secretary of State and Rhode Island Board of Elections share a statutory obligation to ensure full and fair elections, and the Court examines this Consent Decree with a specific eye on that public interest. To the extent that some have suggested the signature and notary requirements are necessary to prevent voter fraud, Rhode

---

[1] The other states with such requirements are Alabama and North Carolina. *See* Ala. Code §§ 17-11-7, 17-11-10; N.C. Gen. Stat. Ann. § 163-231(a).

Island law includes other measures to safeguard against fraud in mail-ballot procedures. The Board of Elections is statutorily required to assess mail-in ballots to ensure that the name, residence, and signature on the ballot itself all match that same information on the ballot application, including ensuring "that both signatures are identical." R.I.G.L. § 17-20-26(c)(2). Additionally, voter fraud in Rhode Island is a felony, punishable by up to ten years of imprisonment and/or a fine of between $1,000 and $5,000. R.I.G.L. §§ 17-23-4, 17-26-1.

Due to the COVID-19 pandemic, Rhode Island's Governor, by executive order, suspended the two-witness or notary requirement for mail ballots in the June 2, 2020, presidential preference primary. R.I. Exec. Order No. 20-27 at 2 (Apr. 17, 2020). In that election, 83% of those voting did so by mail-in ballot, compared to less than 4% in the previous presidential preference primary of May 2016. The Governor has not issued any similar orders for the upcoming elections, despite the Secretary of State's proposal to do so. Further, the Secretary of State promoted legislation to implement mail-in voting for the remaining 2020 elections, including a provision to eliminate the witness or notary requirement. The Rhode Island House of Representatives passed this legislation, but it was not taken up by the Rhode Island Senate. At this time, the Rhode Island General Assembly has adjourned.

During this period of inaction, the COVID-19 pandemic, while it has improved in Rhode Island since the presidential preference primary, continues to threaten and permeate society in this state. Because COVID-19 spreads mainly from person-to-person through close contact with one another and through respiratory droplets when

an infected person coughs or sneezes, mask wearing, social distancing practices, and limitations on the size of group gatherings continue to be public health mandates. Persons in particularly vulnerable demographics—those over age 65 or with preexisting health conditions—remain advised to stay home unless they must venture out for work, medical visits, or to gather necessities.

Although Rhode Island had made much progress in slowing the spread of the virus, recent warnings indicate an uptick in infections and just days before this filing the Rhode Island Governor rescinded a planned move to Stage 4 of the state's reopening plan which would have relaxed restrictions on gatherings and public excursions.  In fact, the governor reduced the maximum size of in person gatherings at a coronavirus briefing held on July 29, 2020.[2]  Rhode Island's rate of transmission has risen to 1.7 – nowhere near the 1.0 goal.  With the elections months away, there is no telling whether the health crisis will improve or become dramatically worse. The most reasonable inference, since Rhode Island is in a worsening trend, is that it will become more grave.

The plaintiffs maintain that the two signature or notary requirement will drive them out of their houses into the general population, with the risk to health that entails.  The plaintiffs have presented data from the U.S. Census Bureau which demonstrates that a large portion of the Rhode Island electorate lives alone. As of 2018, 197,000 Rhode Islanders over the age of 18, 23.45% of the State's voting-age

---

[2] https://www.providencejournal.com/news/20200729/ri-reports-2-coronavirus-deaths-61-new-cases-raimondo-reduces-limit-on-social-gatherings.

population, live alone.  Another 289,000 Rhode Islanders of voting age live with only one other person.  Of the 197,000 Rhode Islanders of voting age who live alone, an estimated 59,000 are aged 65 and older, accounting for 37.82% of all those aged 65 and over in Rhode Island.  For Rhode Islanders of voting age with a disability, an estimated 42,000, or 42%, live alone.

The individual plaintiffs, Miranda Oakley, Barbara Monahan, and Mary Baker, all have provided the Court with affidavits stating that they either live alone or are in high risk groups for COVID-19 because they are of advanced age or are regularly in close contact with those that are, or have preexisting medical conditions. The organizational plaintiffs, Common Cause and the League of Women Voters, have provided affidavits attesting that the majority of their members, who are voters, are of advanced age while others live alone or have preexisting health conditions.  It is their concern that the witness or notary requirements would force them to make "an impossible choice between two irreparable harms—violating social distancing guidelines designed to protect them and their loved ones and foregoing their fundamental right to vote."  (ECF No. 5-1 at 1.)

The plaintiffs therefore have filed the instant suit, putting forth (1) a 42 U.S.C. § 1983 claim that the mail-ballot witness or notary requirement, as applied to the September 2020 primary and November 2020 general elections, imposes an undue burden on their right to vote in violation of the First and Fourteenth Amendments to the United States Constitution; and (2) a claim for violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* because the challenged

provisions disadvantage individuals with disabilities from participating safely in the upcoming elections and do not provide them with reasonable accommodations.

Regarding their constitutional claim, the plaintiffs assert that the witness requirement for mail voting constitutes "a severe burden on the right to vote because it forces voters to choose between exercising the franchise safely or violating social distancing guidelines and exposing themselves, their families, and their communities to a heightened risk of COVID-19." (ECF No. 1 ¶ 60.) Moreover, they argue, the State has no interest sufficient to justify maintaining the witness requirement during the COVID-19 pandemic. In response to the argument that the witnessing requirement ensures the integrity of the election, the plaintiffs counter that, while the prevention of fraud is a legitimate state interest, the state has other safeguards, including signing under oath and signature matching which protect the integrity of the voting process. There is no information in the record, nor was any brought forth, that recent Rhode Island elections are susceptible to fraud.

On July 23, 2020, shortly after filing their Complaint, the plaintiffs moved for a preliminary injunction to enjoin the defendants from enforcing the witness or notary requirements. The Court held a conference with all parties on Friday, July 24, 2020, at which time the parties informed the Court that they would seek to craft a consent decree, due to the defendants' sharing of the plaintiffs' concerns and general agreement with the plaintiffs' request, thus possibly obviating the need to proceed with the plaintiffs' motion for a preliminary injunction. The parties agreed to discuss a consent decree over the weekend and the Court scheduled a hearing on the

6

plaintiffs' motion for Monday, July 27, in the event the negotiations failed.

Also discussed at the Friday, July 24, conference was the Rhode Island Republican Party's publicly stated intention to seek to intervene in the matter and oppose the plaintiffs' Complaint.[3]  On that same Friday, counsel for the Secretary of State informed counsel for the Rhode Island Republican Party that the parties were going to negotiate a consent decree and that if the Republican Party was going to attempt to intervene, it should do so quickly.  Yet, it was not until more than 48 hours later, at approximately midnight on Sunday, July 26, that the Republican National Committee ("RNC") and the Rhode Island Republican Party filed a Motion to Intervene.[4]

By Monday, July 27, the parties had reached an accord and presented the Court with a proposed Consent Decree for review.  That same day, the Court held another conference with the parties and with representatives of the proposed intervenors, the RNC and Rhode Island Republican Party.  The proposed intervenors, in addition to seeking to intervene, filed an emergency "Protective Motion For Fairness Hearing" to present arguments opposing the proposed Consent Decree.  The Court granted the request for the Fairness Hearing.  Although the Court deferred ruling on the Motion to Intervene, it allowed the proposed intervenors to participate

---

[3] In fact, the local Republican Party had announced that intention the day before, on the same day that this suit was filed.
http://www.ri.gop/aclu_puts_the_integrity_of_our_elections_at_risk (July 23, 2020).

[4] Notably that motion was not perfected until approximately 6:30 p.m. on Monday July 27 by the filing of a proposed answer.  See FRCP 24 (c).

in the fairness hearing and to provide the Court with written briefing in advance of that hearing. The proposed intervenors did file an Objection to the proposed Consent Decree and were heard, in equal measure to the parties, at the Fairness Hearing.

The Court conducted the Fairness Hearing on July 28, 2020, during which counsel for all parties, as well as the proposed intervenors, presented argument for and against approval of the proposed Consent Decree and on the Motion to Intervene.[5]

---

[5] At the Fairness Hearing, the Court heard argument on the RNC and Rhode Island Republican Party's Motion to Intervene. The Court denied that Motion, finding that the proposed intervenors had not timely sought to intervene and that their interest, for a fair and lawful election, was adequately represented by the existing parties. *See* Fed. R. Civ. P. 24. Specifically, even though the time between the filing of the lawsuit and the Motion to Intervene was short in terms of actual days, it was well within the capability of the RNC and local party to meet. Although the RNC protests it did not hire its counsel until Saturday night, delay is counted toward litigants, not lawyers, and the local Party was already represented. Nothing, certainly, prohibited the RNC even on Saturday night from filing a motion to intervene, announcing its intention, and seeking more time if necessary, to file a memorandum. That, at least, would have put the parties on formal notice that the RNC was prepared to actively participate. Instead, the parties worked extensively over the weekend toward crafting a settlement. In addition, the Court found that the RNC did not assert an interest any different from that asserted by the named defendants. They simply claimed a desire to "protect" their voters from possible election fraud and to see that existing laws remained enforced. That is the same interest the defendant agencies are statutorily required to protect. The point of the would-be intervenors was their naked assertion that the defendant-parties were not adequately protecting those interests because there had been "collusion" between them and the plaintiffs. This Court found no evidence of collusion. The fact that two agencies with expertise independently reached the conclusion that the health risk was real, that the signature and notary requirements unduly burdened the right to vote, and that the parties could reach a workable solution that protected the integrity of the election, does not show collusion. If anything, it points to the reasonableness and fairness of the Consent Decree. Finally, the Court rejected the proposed intervenors' main argument that "changing the rules" on the eve of an election would cause voter confusion. In fact, the opposite is true. The last rules explained to voters eliminated the signature and notary requirement for the June 2, 2020, presidential preference

## II.   LEGAL STANDARD

A consent decree "embodies an agreement of the parties," that they "desire and expect will be reflected in, and be enforceable as, a judicial decree." *Aronov v. Napolitano*, 562 F.3d 84, 90–91 (1st Cir. 2009) (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004)).  Because it is entered as an order of the court, a consent decree is distinguished from a private settlement in that the latter do not "entail judicial approval and oversight." *Id.*

For that reason, a "court entering a consent decree must examine its terms to be sure they are fair and not unlawful." *Id.* at 91.  Approval of a consent decree is "committed to the trial court's informed discretion." *Puerto Rico Dairy Farmers Ass'n v. Pagan*, 748 F.3d 13, 20 (1st Cir. 2014).  "Woven into the abuse of discretion standard here is a 'strong public policy in favor of settlements ....'" *Id.* (quoting *U.S. v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 280 (1st Cir. 2000)).

Should a third-party object to a consent decree, that party is entitled "to present evidence" and "have its objections heard." *Id.* (quoting *Local No. 93, Int'l Ass'n of Firefighters, AFL–CIO v. City of Cleveland*, 478 U.S. 501, 529 (1986)).  The key consideration in this type of inquiry is whether there has been "a fair opportunity to present relevant facts and arguments to the court, and to counter the opponent's submissions." *Id.*  The objecting party's "right to be heard, however, does not translate into a right to block a settlement." *Id.* (citing *Local No. 93*, 478 U.S. at 529).

When reviewing a consent decree,

---

primary.  Approving the Consent Decree maintained that status quo.  *Enforcing* the signature and notary requirement would have "changed the rules."

> the district court must assure itself that the parties have validly consented; that reasonable notice has been given possible objectors; that the settlement is fair, adequate, and reasonable; that the proposed decree will not violate the Constitution, a statute, or other authority; that it is consistent with the objectives of Congress; and, if third parties will be affected, that it will not be unreasonable or legally impermissible as to them.

*Durrett v. Hous. Auth. of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).

## III.   DISCUSSION

The Court is satisfied that the parties to the Consent Decree—the plaintiffs, the Secretary of State, and the members of the Board of Elections—all have validly consented to its terms.  The Consent Decree was drafted by those parties over a weekend of negotiations.  Additionally, reasonable notice has been given to possible objectors: the RNC and local Republican Party were given an opportunity to provide the Court with extensive briefing and to argue their position at the Fairness Hearing.

While the Consent Decree seeks to transgress existing Rhode Island statutory election law, had there been a hearing on the merits of the plaintiffs' prayer for injunctive relief, the Court would have found that the mail-ballot witness or notary requirement, as applied during the COVID-19 pandemic, is violative of the First and Fourteenth Amendments to the United States Constitution because it places an unconstitutional burden on the right to vote.  As the supreme law of the land, the United States Constitution supersedes any conflicting state statute.  *See* U.S. Const. Art. IV.  The Court therefore finds that the Consent Decree is lawful.

The Court also finds that the Consent Decree is fair, adequate, and reasonable. The RNC argued that the because the defendants generally were in agreement with

the plaintiffs' position on the witness or notary requirement, the litigation lacked adversarial vigor which made it collusive and, therefore, unfair.  (ECF No. 21 at 19-20.)  But no evidence of collusion among the parties has been presented to this Court; in fact, the parties have represented that they engaged in good-faith negotiations in the crafting of the Consent Decree's terms.  It is clear that the Consent Decree was a compromise reached after sincere, arm's length negotiations.  Indeed, the plaintiffs sought to do away with all extra identity requirements such as providing, in appropriate circumstances, the last four digits of a voter's Social Security Number or a photographic ID.  But the parties agreed to suspend the witness and notary requirement and retain these extra identity requirements.  This compromise and the fact that the plaintiffs did not get everything that they sought in the Consent Decree, as well the fact that the defendants notified the proposed intervenors of the status of the case immediately after Friday's conference suggest that the proposed intervenors' argument that this agreement was not at arm's length and was otherwise collusive is wholly without merit or evidence.

The adequacy and reasonableness of the Consent Decree also is evident by the fact that it sets forth the exact mail-ballot protocols successfully used during the June 2, 2020, presidential preference primary.

Finally, the Consent Decree is not legally impermissible as to the RNC or the Rhode Island Republican Party.  Had the parties not reached a Consent Decree to suspend the witness or notary requirements for the remaining 2020 elections, this Court is empowered to find that the requirement, as applied in the current pandemic,

unconstitutionally limits voting access, and therefore order precisely what the Consent Decree achieves. *See, e.g., Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (holding that the constitutionality of election laws depends upon a court's balancing of the character and magnitude of any law burdening the right to vote against the relevant government interest served by the law); *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Barr v. Galvin*, 626 F.3d 99, 109 (1st Cir. 2010).

The proposed intevenors argued at the Fairness Hearing that, even if this Court were to find that the statutory requirement, as applied during the current pandemic was violative of the constitution, the Court would be powerless to intervene as the legislature had not acted. This rather improbable argument, when taken to its extreme would mean that no court could invalidate unconstitutional restrictions on voting as long as state legislatures had declined to do so. A long history of federal court review of voting laws says the contrary. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote." *Reynolds v. Sims*, 377 U.S. 533, 554-56 (1964).

## IV.    CONCLUSION

For the foregoing reasons, the parties' Joint Motion to Approve Consent Judgment (ECF No. 18) was GRANTED on July 28, 2020. The Court therefore enters the Consent Judgment and Decree (ECF No. 18-1).

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge
July 30, 2020